1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIA SOCORRO VEGA, | Case No. 1:19-cv-00484-ADA-SAB |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS RECOMMENDING PLAINTIFF'S MOTION TO CERTIFY CLASS BE DENIED |
| v. | |
| DELAWARE NORTH COMPANIES, INC., et al., | (ECF Nos. 82, 84, 102, 108) |
| Defendants. | **OBJECTIONS DUE: TWENTY-ONE DAYS** |

Plaintiff Maria Socorro Vega ("Plaintiff"), individually and on behalf of all others similarly situated, maintains this putative class action alleging wage and hour violations. (See ECF Nos. 53, 66.) Currently before the Court is Plaintiff's motion for class certification. (ECF No. 82.) A hearing on the motion was held on August 30, 2023. (ECF No. 109.) Counsel Irina A. Kirnosova appeared by videoconference for Plaintiff. Counsel Bethany Anne Pelliconi and Jon D. Meer appeared by videoconference for Defendants DNC Parks & Resorts at Tenaya Inc., and Delaware North Companies, Inc. Having considered the moving, opposition, and reply papers, the declarations and exhibits attached thereto, the arguments presented at the hearing held on August 30, 2023, as well as the Court's file, the Court issues the following findings and recommendations recommending that Plaintiff's motion be denied.

/ / /

**I.**

**BACKGROUND**

This matter arises from original Plaintiff David Perez's ("Perez") putative class action lawsuit alleging various wage-and-hour violations by Defendants DNC Parks & Resorts at Asilomar, Inc., DNC Parks & Resorts at Sequoia, DNC Parks & Resorts at Yosemite, Inc., Delaware North Companies, Inc., DNC Parks & Resorts at King's Canyon, Inc., DNC Parks & Resorts at Tenaya Inc., and Delaware North Companies Parks & Resorts, Inc.  The case was filed by Perez in Tulare County Superior Court, but Defendants removed the action to this federal court on April 12, 2019.  (ECF No. 1.)  On October 30, 2019, the Court granted Defendants' motion for judgment on the pleadings and dismissed Perez's complaint, but granted Perez leave to amend to: (1) file a first amended complaint addressing the deficiencies identified by the Court; (2) add Maria Socorro Vega as a plaintiff; and (3) add claims under the Fair Labor Standards Act ("FLSA").  (ECF No. 36.)  The Court also dismissed Defendant Asilomar from this action with prejudice.  (Id. at 10.)

On November 14, 2019, Plaintiffs Perez and Vega filed their first amended complaint ("FAC"), which Defendants moved to dismiss and strike.  (ECF Nos. 38, 39, 40.)  On July 29, 2020, the Court granted Defendants' motion to dismiss in part and denied their motion to strike as moot.  (ECF No. 51.)  The Court dismissed several claims asserted by Plaintiffs without leave to amend, but also granted leave to amend the complaint.  (Id. at 8, 10, 19.)

On August 14, 2020, Plaintiffs filed the operative second amended complaint ("SAC"), asserting claims for: (1) failure to provide required meal breaks; (2) failure to provide required rest breaks; (3) failure to pay overtime wages; (4) failure to pay minimum wages; (5) failure to furnish accurate itemized wage statements; (6) unfair and unlawful business practices under California's Unfair Competition Law ("UCL"); (7) penalties under the Labor Code Private Attorneys General Act of 2004 ("PAGA"), as a representative action; and (8) failure to pay all wages and overtime compensation in violation of the FLSA.  (ECF No. 53.)  On August 26, 2020, Defendants moved to dismiss and strike the SAC.  (ECF Nos. 54, 55.)  The Court partially-granted the motions to dismiss and dismissed Plaintiff's third, fourth, fifth, and eighth claims,

without leave to amend; denied the motions to dismiss as to Plaintiffs' first, second, sixth, and seventh claims; dismissed Defendants Delaware North Companies Parks & Resorts, Inc., DNC Parks & Resorts at Sequoia, and DNC Parks & Resorts at Yosemite, Inc. from the action; and denied Defendants' motion to strike.  (ECF No. 66.)

On March 4, 2022, remaining Defendants DNC Parks & Resorts at King's Canyon, Inc., DNC Parks & Resorts at Tenaya Inc., and Delaware North Companies, Inc. answered the SAC. (ECF No. 69.)  On March 22, 2022, the parties stipulated to the dismissal of Plaintiff Perez and DNC Parks & Resorts at King's Canyon, Inc.  (ECF No. 70.)  Thus, this matter is currently proceeding with Plaintiff Vega against Defendants DNC Parks & Resorts at Tenaya Inc., and Delaware North Companies, Inc. (collectively herein, "Defendants") on: (1) the first cause of action for failure to provide meal periods pursuant to Cal. Labor Code §§ 226.7, 510, 512, 1194, 1197; IWC Wage Order No. 5-2001, § 11; (2) the second cause of action for failure to provide required rest periods pursuant to Cal. Labor Code §§ 226.7, 512; IWC Wage Order No. 5-2001, § 12; (3) the sixth cause of action for unfair and unlawful business practices pursuant to Cal. Bus. & Prof. Code §§ 17200 *et. seq.*; and (4) penalties under PAGA as a representative action.

As to the meal and rest break claims, the SAC alleges Defendants' policies required that Plaintiffs "remain on their work premises during rest breaks"; that Plaintiffs did not take full rest or meal breaks on various dates due to walking between workstations and rest break areas, and sometimes because Defendants' supervisory employees at times interrupted Plaintiffs during their breaks to ask work-related questions; that Plaintiffs were not provided meal breaks for shifts over five or six hours long on various dates; and that Defendants did not pay Plaintiffs a premium for missed or shortened meal or rest breaks.  (See SAC ¶¶ 19–22, 24, 30–39, ECF No. 53.)

A scheduling order issued on March 29, 2022, setting pre-certification discovery and motion filing deadlines.  (ECF No. 74.)  It has been modified multiple times.  (See ECF Nos. 81, 87, 94, 107.)

On February 17, 2023, Plaintiff filed the motion to certify class.[1]  (Pl.'s Mot. Supp. Class

---

[1] After Plaintiff filed the motion to certify class, Defendant filed an *ex parte* motion seeking to depose witness declarants not previously identified by Plaintiff, which the Court partially granted.  (See ECF Nos. 86–94.)  As a result, Defendants were permitted time to depose Plaintiff's newly identified witness declarants and the deadline to

1    Certification ("Mot"), ECF No. 82.)  Defendants timely opposed the motion on July 28, 2023.[2]

2    (ECF No. 105.)  On August 23, 2023, Plaintiff timely replied to the opposition.  (ECF No. 108.)

3    On August 30, 2023, the parties appeared before the Court, as previously noted, for the hearing

4    on Plaintiff's motion to certify the class (ECF No. 109), and this matter was deemed submitted.

## II.

## LEGAL STANDARD

Rule 23 of the Federal Rules of Civil Procedure governs certification of the class in a class action.  The plaintiff seeking class certification bears the burden of demonstrating that each of the requirements of Rule 23(a) and at least one of the requirements of Rule 23(b) have been met.  Ellis v. Costco Wholesale Corp., 657 F.3d 970, 979 (9th Cir. 2011); see also Comcast Corp. v. Behrend, 133 S.Ct. 1426, 1432 (2013).  Rule 23(a) requires the party seeking class certification to establish that:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  These four requirements are referred to as "numerosity, commonality, typicality and adequacy of representation."  Evon v. Law Offices of Sidney Mickell, 688 F.3d 1015, 1028 (9th Cir. 2012); Bias v. Wells Fargo & Co., 312 F.R.D. 528, 534 (N.D. Cal. 2015).

---

oppose the class certification motion was continued.  (ECF No. 94.)  Further discovery disputes ensued when Defendants were unable to depose Plaintiff's witnesses, due to certain witnesses refusing to appear for their depositions, lack of contact information, and Plaintiff's refusal to accept subpoenas on behalf of the witnesses.  (See ECF No. 96–98.)  This resulted in an informal discovery conference and the parties' stipulation to strike the witnesses declarations of Reina Oviedo, Alfredo Marquez, Sandra Diaz, and Kalli Southwood from Plaintiff's class certification motion.  (ECF Nos. 99, 100.)  As such, these declarations shall not be considered in the Court's analysis of Plaintiff's class certification motion.

[2] After Defendants filed their opposition to the class certification motion, Plaintiff filed an *ex parte* application seeking additional time to depose the witnesses who submitted declarations in support of Defendants' opposition.  (ECF No. 103.)  This application, however, was denied due to lack of a showing of diligence on Plaintiff's part in seeking the depositions.  (See ECF No. 107.)

1   "These requirements effectively 'limit the class claims to those fairly encompassed by the named

2   plaintiff's claims' " by ensuring that the named plaintiffs have suffered the same injury and

3   possess the same interest as the other class members.  <u>Gen. Tel. Co. v. Falcon</u>, 457 U.S. 147

4   (1982).

5       The district court must perform "a rigorous analysis" of each of the Rule 23(a) factors in

6   determining whether the requirements of Rule 23 have been satisfied.  <u>Wal-Mart Stores, Inc. v.</u>

7   <u>Dukes</u>, 564 U.S. 338, 350 (2011); <u>Ellis</u>, 657 F.3d at 980.  [T]he merits of the class members'

8   substantive claims are often highly relevant when determining whether to certify a class.  More

9   importantly, it is not correct to say a district court *may* consider the merits to the extent that they

10  overlap with class certification issues; rather, a district court *must* consider the merits if they

11  overlap with the Rule 23(a) requirements."  <u>Ellis</u>, 657 F.3d at 981 (emphasis in original) (citing

12  <u>Dukes</u>, 564 U.S. at 351-52).  "Nonetheless, the district court does not conduct a mini-trial to

13  determine if the class 'could actually prevail on the merits of their claims.' "  <u>Gonzalez v. Millard</u>

14  <u>Mall Servs., Inc.</u>, 281 F.R.D. 455, 460 (S.D. Cal. 2012) (quoting <u>Ellis</u>, 657 F.3d at 983 n.8.)

15      The movant must then demonstrate that their claims fall under one of the categories listed

16  in Rule 23(b): (1) that there is a risk of inconsistent adjudications from separate actions that

17  would result in incompatible standards of conduct for the party opposing the class or would be

18  dispositive of the interests of members not parties to the actions or would substantially impair

19  their ability to protect their interests; (2) the party opposing the class has acted or refused to act

20  on grounds that apply generally to the class, so that final injunctive or corresponding declaratory

21  relief is appropriate respecting the class as a whole; or (3) the court finds questions of law or fact

22  common to class members predominate over any questions affecting only individual members,

23  and a class action is superior to other methods of adjudicating the controversy.  Fed. R. Civ. P.

24  23(b)(1)-(3); <u>Wright v. Linkus Enterprises, Inc.</u>, 259 F.R.D. 468, 471 (E.D. Cal. 2009).

25  / / /

26  / / /

27  / / /

28  / / /

# III.

# DISCUSSION

Plaintiff seeks to certify a class which is defined as:

> All non-exempt employees of Defendant DNC Parks & Resorts at Tenaya, Inc. ("Tenaya") during the period of February 28, 2015 through the date of the order granting class certification ("Class Period").

(Mot. 2.)  In addition, Plaintiff seeks to certify the following sub-classes:

> Meal Period Subclass: All non-exempt employees of Tenaya who worked one or more shifts over five hours during the Class Period.
>
> Second Meal Period Subclass: All non-exempt employees of Tenaya who worked one or more shifts over ten hours during the Class Period.
>
> Rest Break Subclass: All non-exempt employees of Tenaya who worked one or more shifts of 3.5 hours or more during the Class Period.

(Id.)

Plaintiff seeks certification of the above-defined class and sub-classes for the claims alleged in the SAC for (1) failure to provide require meal periods, (2) failure to provide required rest breaks, and (3) violation of the UCL.  (Id.)  Plaintiff seeks to appoint herself, Maria Socorro Vega, as a representative for the proposed classes, and counsel Matern Law Group, PC, Matthew J. Matern, Mikael H. Stahle, and Irina A. Kirnosova as class counsel for the proposed classes. (Id. at 2–3.)  Plaintiff contends this action is maintainable as a class action pursuant to Rule 23(a) and 23(b)(3).  (Id. at 2.)

## A.    Plaintiff's Request for Adverse Inference

Before discussing arguments regarding evidentiary presumptions below under California law that are emphasized by Plaintiff, the Court first finds it prudent to preliminarily address Plaintiff's request for a general adverse evidentiary inference, contained at various points in briefing.

Plaintiff proffers the 30(b)(6) witness testified non-exempt employees were required to record their rest breaks on handwritten timesheets, yet Defendants failed to produce such

timekeeping records for anyone other than Plaintiff even though Plaintiff requested all such records in her Requests for Production of Documents.[3]

The highlighted testimony is as follows:

> Q. And you mentioned in housekeeping there being a paper record of employees' breaks. Were those rest breaks or meal breaks?
>
> A. They were rest breaks.
>
> Q. And were those --
>
> A. So just to -- just to explain a little further, there are multiple areas people can rest on their rest break. Those are considered paid, so they're not punching in and out.
>
> And based on where they are on the property -- so, say, they're over at the Cabins, they can sit outside. They can rest in an empty guest room. If they're in the Cottages, it's the same thing. There's a smaller housekeeping area over there. They can stay in a guest room and take ten minutes as well, a vacant room.
>
> Q. So in terms of the paper forms where housekeeping employees recorded rest breaks, were those punches for rest breaks incorporated into the electronic timekeeping records in any way?
>
> A. No.

(Dep. Debra Goehring ("Goehring Dep.") at 86:11-87:6, ECF No. 82-2 at 8.)

Plaintiff argues that even for her, Defendants only produced handwritten rest break timesheets for a handful of shifts from the hundreds of shifts Plaintiff worked during the class period, and Plaintiff proffers, without specific explanation, that even those show violations on their face.  (See Ex. 6, ECF No. 82-2 at 258.)  Thus, in the motion, and in reply, Plaintiff requests an adverse inference be imposed given the proffered failure to provide such discovery.  In support of this request, Plaintiff argues Defendants are in the best position to provide affirmative evidence that the handwritten rest break records show that employees received all required rest periods, if

---

[3]  Plaintiff requested: "All DOCUMENTS which evidence the dates and hours worked by all COVERED EMPLOYEES during the COVERED PERIOD, in edited and un-edited format, including but not limited to time cards, handwritten time cards, electronic time cards, meal period records, rest period records, sign-in sheets, and attendance records."  (ECF No. 82-2 at 309.)  Defendant objected "to this request to the extent it seeks class-wide evidence, or documents regarding specific, individual practices, given that there has been no decision on class certification and there has been no showing that class certification is viable. Subject to and without waiving these objections, Defendant responds as follows: Defendant will meet and confer with Plaintiff regarding the production of a sample of records of the potential class members' time records."  (Id.)

1  that is what it contends, yet refused to provide any such evidence, except for a few of Plaintiff's

2  shifts, and its refusal should not be rewarded.  (Mot.. 23-24.)  Plaintiff requests the court should

3  infer that the handwritten rest break records are unfavorable to Tenaya and demonstrate

4  widespread rest break violations.   Plaintiff similarly contends that the Court should infer

5  Defendants have not obtained any lawful meal period waivers from the class members because it

6  failed to produce waivers in response to Plaintiff's request for production.  (Mot. 20-21.)

7         As for waivers, Defendants respond that they produced: (1) all waiver forms used during

8  the class period; (2) an Excel report showing the waivers executed by an agreed upon sample of

9  the putative class members; and (3) the waiver forms that were electronically signed by each of

10  Plaintiff's declarants.  As for records overall, Defendants argue they produced a sample of the

11  potential class members' time records, and that it would be ridiculous to expect every single time

12  record, for every single shift, for every single employee, for every single workday during an eight

13  year liability period, prior to any ruling on class certification.

14         To the Court, most significant as to both categories, is the fact no discovery motion was

15  ever filed by Plaintiff with respect to any deficiency with Defendants' responses.  The Court does

16  not find it should afford Plaintiff the benefit of an adverse inference at this stage, based on this

17  record of discovery, absent any motion to compel or order from the Court ordering production nor

18  violation of such type of order.[4]

19         Courts recognize that adverse inference instructions are a harsh sanction.  Apple Inc. v.

20  Samsung Elecs. Co., 888 F. Supp. 2d 976, 993–94 (N.D. Cal. 2012) (collecting cases and stating

21  "the Court does not find that such a strong adverse inference instruction is justified by this record

22  [as] courts must choose 'the least onerous sanction corresponding to the willfulness of the

23  destructive act and the prejudice suffered by the victim[,]' . . .any exercise of a court's inherent

24

---

25  [4]  If a party fails to obey an order to provide or permit discovery, the court may issue further just orders, which may
include: "(i) directing that the matters embraced in the order or other designated facts be taken as established for

26  purposes of the action, as the prevailing party claims; (ii) prohibiting the disobedient party from supporting or
opposing designated claims or defenses, or from introducing designated matters in evidence; (iii) striking pleadings

27  in whole or in part; (iv) staying further proceedings until the order is obeyed; (v) dismissing the action or proceeding
in whole or in part; (vi) rendering a default judgment against the disobedient party; or (vii) treating as contempt of
court the failure to obey any order except an order to submit to a physical or mental examination."  Fed. R. Civ. P.

28  37(b)(2)(A).

powers must be exercised with great restraint and discretion [and while] an adverse inference instruction is a 'lesser' sanction than dismissal or default . . . does not mean it should be imposed casually."); Nutrition Distribution LLC v. PEP Rsch., LLC, No. 16CV2328-WQH-BLM, 2018 WL 6323082, at *5 (S.D. Cal. Dec. 4, 2018) ("An adverse inference instruction is a harsh sanction . . . Courts vary the language of an adverse inference instruction according to the degree of fault of the spoliating party.").  Adverse inference instructions are generally utilized where there is a showing of spoliation of evidence, or a complete and demonstrated failure to provide particular documents, or types of documents.  See Nutrition Distribution LLC v. PEP Rsch., LLC, No. 16CV2328-WQH-BLM, 2018 WL 6323082, at *4 (S.D. Cal. Dec. 4, 2018) ("Courts in the Ninth Circuit apply a three-element test when a party seeks an adverse inference instruction on grounds of spoliation: (1) the person in control of the evidence had the obligation to preserve relevant evidence at the time of destruction, (2) the evidence was destroyed with a culpable state of mind, and (3) the evidence was relevant."); Parrick v. FedEx Ground Package Sys., Inc., No. CV 09-95-MDWMJCL, 2010 WL 3724825, at *4 (D. Mont. Sept. 17, 2010) (in denying a request for terminating sanctions, imposing adverse inference, after numerous discovery disputes, after the repeated failure to produce documents previously ordered, and failure that had an impact on the ability complete a deposition relevant to the missing documents pertaining to company policies).

Plaintiff has provided no persuasive authority that an adverse inference finding is appropriate on a class certification, in the absence of a discovery motion.  Accordingly, the Court shall finds Plaintiff's request for an adverse inference should be denied.

**B.      Rule 23 Criteria**

The Court finds it appropriate, given the parties' arguments, to first briefly address numerosity and adequacy of representation, before considering commonality, typicality, and the Rule 23(b)(3) factors, collectively.

1.      Numerosity

Numerosity is met if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  There is no absolute number or cut-off for determining

1   numerosity, and the specific facts of each case may be examined.  Schwarm v. Craighead, 233

2   F.R.D. 655, 660 (E.D. Cal. 2006); Cervantez v. Celestica Corp., 253 F.R.D. 562, 569 (C.D. Cal.

3   2008).  "A reasonable estimate of the number of purported class members satisfies the numerosity

4   requirement of Rule 23(a)(1)."  In re Badger Mountain Irr. Dist. Sec. Litig., 143 F.R.D. 693, 696

5   (W.D. Wash. 1992); see also Cervantez, 253 F.R.D. at 569 ("Courts have not required evidence

6   of specific class size or identity of class members to satisfy the requirements of Rule 23(a)(1).").

7        Plaintiff seeks to certify a class of current and former non-exempt employees of

8   Defendants working in the State of California who were denied appropriate meal and rest breaks

9   due to Defendants' failure to provide coverage for breaks due to understaffing, and its

10  requirement that all employees carry walkie-talkies during their breaks, which Plaintiff contends

11  subjected the employes to Defendants' control at all times during breaks.  (Mot. 13, 16.)  Plaintiff

12  maintains the proposed class consists of approximately 1,500 non-exempt employees in

13  California.  (ECF No. 82 at 17; Decl. Nora Ostrofe ("Ostrofe Decl.") ¶ 9, ECF No. 82-3.)  She

14  contends that a sample of 20% of all non-exempt employees who worked for Tenaya during the

15  class period revealed 285 employees who experienced meal period violations evident in Tenaya's

16  timekeeping and payroll records.  (ECF No. 82 at 17; Ostrofe Decl., Table 1A.)  Plaintiff

17  contends, when extrapolated to 100%, this means at least 1,425 employees worked shifts over

18  three and one-half hours and experienced rest period violations as a result of Tenaya's

19  understaffing and walkie-talkie practices.  (ECF No. 82 at 17.)

20       Given the lack of direct opposition to Plaintiff's proffer, the Court finds the proposed class

21  of 1,500 members satisfies the numerosity requirement as joinder of such members is

22  impracticable.  See Celano v. Marriott Int'l, Inc., 242 F.R.D. 544, 549 (N.D. Cal. 2007) (noting

23  "courts generally find that the numerosity factor is satisfied if the class comprises 40 or more

24  members and will find that it has not been satisfied when the class comprises 21 or fewer.");  In re

25  Badger, 143 F.R.D. at 696 (reasonable estimate sufficient).

26       2.    Adequacy of Representation

27       The Court must ensure "the representative parties will fairly and adequately protect the

28  interests of the class."  Fed. R. Civ. P. 23(a)(4).  In determining whether the named plaintiffs will

adequately represent the class, the courts must resolve two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  Ellis, 657 F.3d at 985 (quoting Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998).  "Adequate representation depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees."  Ellis, 657 F.3d at 985 (citing Molski v. Gleich, 318 F.3d 937, 955 (9th Cir.2003)).   Class representatives "must be part of the class and possess the same interest and suffer the same injury as the class members."   Amchem Prod., 521 U.S. at 626 (internal quotations and citations omitted).  This factor also tends to merge with the commonality and typicality criteria of Rule 23.  Id. at 626 n.20.

Plaintiff asserts she has suffered the same injury and possesses the same interest as the unnamed class members, and argues she has represented her co-workers with a focus and zeal true to the fiduciary obligation she has undertaken, preparing and sitting for deposition, responding to written discovery, and working closely with attorneys throughout the case.  (Mot. 25; Vega Decl. ¶¶ 9.)  Plaintiff does not appear to have any interests that are antagonistic to the class.  (Mot. 25; Vega Decl. ¶¶ 10–11.)

Plaintiff is represented by Matthew J. Matern, Mikael H. Stahle, and Irina A. Kirnosova, of Matern Law Group, PC.  The Court finds they are well qualified and have significant experience litigating complex civil matters and class actions, including similar wage and hour litigation in both California state and federal courts.  (Mot. 25–26; Decl. Mikael Stahle Supp. Mot. ("Stahle Decl.") ¶¶ 3–13, ECF No. 82-2 at 1.)[5]

---

[5]  Counsel Stahle proffers the Matern Law Group is a 26-attorney firm that practices employment litigation, almost exclusively representing employees in individual and class actions in state and federal courts throughout California, and has handled numerous wage and hour class action lawsuits.  (Stahle Decl. ¶¶ 2–3.)  Matthew J. Matern is the principal of Matern Law Group, has been an active member of the State Bar of California since September 1992, has concentrated his practice on employment litigation since approximately 1997, and has been involved in over 100 class action settlements.  (Stahle Decl. ¶¶ 4–8.)  Mikael H. Stahle, a senior association at Matern Law Group, has practiced civil litigation in California state and federal courts for the past 25 years, with the past 19 years primarily devoted to class action litigation, having been appointed class counsel in over 25 class actions.  (Stahle Decl. ¶¶ 9–11.)  Irina A. Kirnosova has been an active member of the California State Bar since 2016, and has experience with single-plaintiff and class action lawsuits in state and federal courts in California, including numerous appeals regarding wage and hour issues.  (Stahle Decl. ¶¶ 12.)

Defendants do not directly dispute that Plaintiffs can meet the adequacy of representation requirement.   (See Opp'n 7 (noting Defendants' position that Plaintiff cannot meet the requirements of Rule 23(a)(2)-(3), and 23(b)(3)). Below, the Court finds Plaintiff has not satisfied the requirements of typicality and commonality, in that there are individualized issues, and thus could weigh in favor of finding Plaintiff has not suffered the same injuries, an argument she proffers in support of adequacy.   See Amchem Prod., 521 U.S. at 626 n.20 (adequacy tends to merge with commonality and typicality).   Nonetheless, given no opposition and consideration of the overall standards, the Court finds that Plaintiff has demonstrated that she and her counsel are adequate representatives for the class and that there is no apparent potential for conflict of interest with the unnamed class members that would weigh against such finding.

3.   The Court finds Consideration of Commonality and Typicality Under Rule 23(a), and Predominance Under Rule 23(b)(3), Weigh in Favor of Denying Class Certification

While recognizing the separate statutory requirements, given the parties' arguments and the applicable overlapping legal standards, the Court finds it appropriate to weigh the Rule 23(a) factors of commonality and typicality, and Rule 23(b)(3)'s requirements, together.

a.   General Legal Standards

Commonality is satisfied where "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  The Ninth Circuit has stated that Rule 23(a)(2) is construed permissively and that "[a]ll questions of fact and law need not be common to satisfy the rule."  Staton, 313 F.3d at 462 (quoting Hanlon, 150 F.3d at 1019).  Indeed, "[t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class."  Id.  "[T]he key inquiry is not whether the plaintiffs have raised common questions," but "whether class treatment will 'generate common answers apt to drive the resolution of the litigation.' "  Arredondo v. Delano Farms Co., 301 F.R.D. 493, 503 (E.D. Cal. Feb. 21, 2014) (citations omitted).  Commonality is not required for all of the claims. It may sufficient if there is one single issue common to the proposed class.  Dukes, 564 U.S. at 359 (stating that even a single common question will satisfy Rule 23(a)(2)); True v. American Honda Motor Co., 749 F.Supp.2d 1052, 1064 (C.D. Cal. 2010); Haley v. Medtronic, Inc., 169

F.R.D. 643, 648 (C.D. Cal. 1996) ("Indeed, for the commonality requirement to be met, there must only be one single issue common to the proposed class."); see also In re Paxil Litig., 212 F.R.D. 539, 549 (C.D. Cal. 2003) (noting that "the commonality requirement is interpreted to require very little").

Rule 23 also requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  Under the rule's permissive standard, claims "need not be substantially identical," but are typical if the representative's claims are "reasonably co-extensive with those of the absent class members." Parsons v. Ryan, 754 F.3d 657, 685 (9th Cir. 2014) (quoting Hanlon, 150 F.3d at 1020).  Typicality is based on the "nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." Parsons, 754 F.3d at 685 (quoting Hanon v. Dataproducts, 976 F.2d at 508).  Typicality tests "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." Id.  The requirements of commonality and typicality occasionally merge, and "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Parsons, 754 F.3d at 685 (quoting Wal-Mart Stores, Inc., 564 U.S. at 349 n.5).

Plaintiff must also show that the action is maintainable under one of the three subdivisions of Rule 23(b).  Hanlon, 150 F.3d at 1022.  Here, Plaintiff seeks to certify the class pursuant to Rule 23(b)(3).  (Mot. 2.)

To certify a class under Rule 23(b)(3), the court must find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  "The shared legal or factual issues must be of sufficient importance to the case that the Court is convinced that the most efficient, fair, and sensible method of adjudication is through a class action." Bias, 312 F.R.D. at 534.  "The Rule 23(b)(3)

predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." <u>Hanlon</u>, 150 F.3d at 1022.  The Ninth Circuit has held that there is clear justification to allow a representative action when "common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication …." <u>Mazza v. Am. Honda Motor Co.</u>, 666 F.3d 581, 589 (9th Cir. 2012) (quoting <u>Hanlon</u>, 150 F.3d at 1022 (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1778 (2d ed. 1986)).  The superiority inquiry under Rule 23(b)(3) "necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution." <u>Hanlon</u>, 150 F.3d at 1023.[6]

"The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D).  " 'A consideration of these factors requires the court to focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis.' " <u>Zinser v. Accufix Rsch. Inst., Inc.</u>, 253 F.3d 1180, 1190 (9th Cir.) (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1780 at 562 (2d ed.1986)).

/ / /

/ / /

/ / /

/ / /

---

[6]  In <u>Hanlon</u>, the alternative methods of resolution were "individual claims for a small amount of consequential damages or latch replacement.' <u>Id.</u>  The Ninth Circuit stated that "[f]urther, the statute of limitations has run for owners of older vehicles under many state laws, and state lemon laws almost universally require that the vehicle be defective beyond repair—a condition which is impossible for many owners to demonstrate[,] [t]hus, many claims could not be successfully asserted individually [and] [e]ven if efficacious, these claims would not only unnecessarily burden the judiciary, but would prove uneconomic for potential plaintiffs." <u>Id.</u>  The court found "[i]n most cases, litigation costs would dwarf potential recovery," that "[i]n this sense, the proposed class action is paradigmatic [and] [a] fair examination of alternatives can only result in the apodictic conclusion that a class action is the clearly preferred procedure in this case." <u>Id.</u>

### b.    General Arguments

Here, Plaintiff maintains the following common questions of law and fact predominate the liability inquiry for each of the classes in this case:

**Common Questions of Fact**

(1)    Did Tenaya engage in a practice of employing too few non-exempt employees (i.e., understaffing) to complete the assigned work within the time allotted?

(2)    Did Tenaya engage in a practice of prohibiting or limiting overtime for non-exempt employees?

(3)    Did Tenaya engage in a practice of requiring non-exempt employees to carry walkie-talkies or cellular phones and keep them on during meal and rest breaks?

**Common Questions of Fact and Law**

(1)    <u>Meal Break Subclass:</u>

(a) Did Tenaya's practice of understaffing impede or discourage non-exempt employees from taking compliant first meal breaks?

(b) Did Tenaya's practice of prohibiting or limiting overtime impede or discourage non-exempt employees from taking compliant first meal breaks?

(c) Did Tenaya's practice of requiring walkie-talkies during meal breaks impede or discourage non-exempt employees from taking compliant first meal breaks?

(2)    <u>Second Meal Break Subclass</u>

(a) Did Tenaya's practice of understaffing impede or discourage non-exempt employees from taking compliant second meal breaks?

(b) Did Tenaya's practice of prohibiting or limiting overtime impede or discourage non-exempt employees from taking compliant second meal breaks?

(c) Did Tenaya's practice of requiring walkie-talkies during meal breaks impede or discourage non-exempt employees from taking compliant second meal breaks?

(3)    <u>Rest Break Subclass:</u>

(a) Did Tenaya's practice of understaffing impede or discourage non-exempt employees from taking compliant rest breaks?

(b) Did Tenaya's practice of prohibiting or limiting overtime impede or discourage non-exempt employees from taking compliant rest breaks?

(c) Did Tenaya's practice of requiring walkie-talkies during meal breaks impede or discourage non-exempt employees from taking compliant rest breaks?

(Mot. 9–11.)

Plaintiff contends that her theories of liability present common legal and factual questions with respect to the meal period claims because Tenaya's practice of understaffing throughout its departments and its policy of requiring employees to carry walkie-talkies during their breaks affected the meal and rest breaks of all members of the putative class. (Mot. 17–19.) In support of this contention, Plaintiff argues a rebuttable presumption that an employee was not relieved of duty and no meal period was provided arises where a meal break is not recorded on time records for a shift over five hours long; thus, Defendants' records, which do not show that lawful meal breaks were provided, raise the rebuttable presumption that no meal periods were provided. (Mot. 19–20.) Accordingly, Plaintiff proffers that, of the 20% sample records received from Tenaya in discovery, the meal period violation rate was 29.93% in 2015—2021 and 43.22% in 2022; and the second meal period violation rate was 83.14%. (Mot. 19.) Furthermore, Plaintiff contends Tenaya's supervisors instructed or pressured employees to clock out and continue working through their meal periods and to falsely attest that they took compliant meal periods before they could clock out for the day. (Mot. 20.)

As to typicality, Plaintiff reasserts her claims are sufficiently related to the claims of the putative class members because "[she] was subjected to the same noncompliant practices as other non-exempt employees in California," which resulted in deprivation of compliant meal and rest periods without being paid premiums for each meal and rest period violation. (Mot. 25.)

Plaintiff contends the requirements under Rule 23(b)(3) are satisfied because (A) "class treatment is clearly superior to hundreds of individual actions"; (B) "Plaintiff is not aware of any related cases against Tenaya involving the same claims alleged by Plaintiff in this action"; (C) "the class members worked in California, and California substantive law will govern the outcome of this case"; and (D) class proceedings can be effectively managed. (Mot. 26–27.)

### c.     **Donohue** Presumption

Given Plaintiff's heavy reliance on the Donohue presumption, the Court first preliminary summarizes some of the case law.  In Donohue, the California Supreme Court held that "time records showing noncompliant meal periods raise a rebuttable presumption of meal period violations, including at the summary judgment stage."  Donohue v. AMN Servs., LLC, 11 Cal. 5th 58, 61, 481 P.3d 661, 664 (2021).  "If an employer's records show no meal period for a given shift over five hours, a rebuttable presumption arises that the employee was not relieved of duty and no meal period was provided."  Id. at 74.  In addition to missed meal periods, "the presumption applies to records showing short and delayed meal periods as well."  Id. at 76.  "The presumption derives from an employer's duty to maintain accurate records of meal periods."  Estrada v. Royalty Carpet Mills, Inc., 76 Cal. App. 5th 685, 722–23 (2022) (quoting Donohue, 11 Cal. 5th at 76).[7]  "To place the burden elsewhere would offer an employer an incentive to avoid its recording duty and a potential windfall from the failure to record meal periods."  Id.

"[U]nder Donohue, plaintiffs [can meet their burden of establishing commonality and predominance] by presenting time record evidence" showing noncompliant meal periods, and from those records, the court should presume the employer's liability in failing to provide meal breaks.  Estrada, 76 Cal. App. 5th at 723 (citing Donohue, 11 Cal. 5th at 78).  The burden "would then [] shift[] to [the employer] to show that plaintiffs were provided with compliant meal periods but chose to work instead."  Id.  Therefore, following the presentation of such appropriate time record evidence, the burden would be placed on the employer, "not plaintiffs, to show individual issues predominate[]."  Id. at 723-24.  Furthermore, "[o]nce the Donohue presumption [is] raised… plaintiffs no longer ha[ve] the burden of proving a theory of class liability."  Id. at 725.

---

[7]  "The Donohue presumption is not entirely new [and] can be traced back to Brinker, in which Justice Werdegar provided a concurring opinion rejecting the employer-defendant's argument 'that the question why a meal period was missed renders meal period claims *categorically* uncertifiable.' "  Estrada, 76 Cal. App. 5th at 722–23 (quoting Brinker Rest. Corp. v. Superior Ct., 53 Cal. 4th 1004, 1053 (2012) (Werdegar, J., concurring) (emphasis in original). "Justice Werdegar explained, 'such a per se bar would be inconsistent with the law governing reporting obligations and our historic endorsement of a variety of methods that render collective actions judicially manageable . . . [rather if] an employer's records show no meal period for a given shift over five hours, a rebuttable presumption arises that the employee was not relieved of duty and no meal period was provided . . . [and] [a]n employer's assertion that it did relieve the employee of duty, but the employee waived the opportunity to have a work-free break, is not an element that a plaintiff must disprove as part of the plaintiff's case-in-chief.' "  Id.

1  "Rather, it would have been presumed from the time records [the employer] had provided

2  untimely meal periods to its employees and was liable for those violations." Id. ("Put differently,

3  class liability would be presumed.")  "The burden would then be on [the employer] to show it

4  gave employees compliant meal breaks that were voluntarily not taken." Id.[8]

5      "Employers can rebut the presumption by presenting evidence that employees were

6  compensated for noncompliant meal periods or that they had in fact been provided compliant

7  meal periods during which they chose to work . . .[and the] employer is not liable if the employee

8  chooses to take a short or delayed meal period or no meal period at all." Donohue, 11 Cal. 5th at

9  77-78.  " 'Representative testimony, surveys, and statistical analysis,' along with other types of

10  evidence, 'are available as tools to render manageable determinations of the extent of liability.' "

11  Donohue, 11 Cal. 5th at 77 (quoting Brinker, 53 Cal.4th at 1054).

12      Plaintiff does not argue the Donohue presumption rule applies to the rest break class, and

13  it appears its holding has not been extended to rest breaks.  See Garcia v. Cent. Coast Restaurants,

14  Inc., No. 18-CV-02370-RS, 2022 WL 657972, at *7 (N.D. Cal. Mar. 4, 2022) ("Unlike meal

15  periods, employers are not under an obligation to record rest breaks[;] . . . [t]he California

16  Supreme Court did not address rest breaks in Donohue, and given the underlying logic of

17  Donohue—not to reward employers for a failure to keep required records—there is no indication

18  its holding would be extended to rest breaks as well." (citing Cal. Code Regs. tit. 8, § 11050)).

19      **d.      Meal and Rest Period Law and Defendants' Policies Generally**

20      Pursuant to Labor Code section 226.7, "[i]f an employer fails to provide an employee a

21  meal or rest or recovery period in accordance with a state law . . . the employer shall pay the

22  employee one additional hour of pay at the employee's regular rate of compensation for each

23  workday that the meal or rest or recovery period is not provided." Cal. Lab. Code § 226.7(c); see

24  also 8 Cal. Code Regs. § 11010, subd. 11(D) (meal period), 12(B) (rest period).

---

25  [8]  In Estrada, the court of appeal note that given the trial "court spent significant time pointing out [] inconsistent

26  testimony . . . [the testimony] was a material factor in the court's finding that employee choice created too many individualized issues." 76 Cal. App. 5th at 725.  However, if the trial court were to apply the correct presumption,

27  the court of appeal was "not reasonably certain the conflicting testimony of five employees, from a class of 215 employees, would still have led the court to conclude that employee choice was a significant factor and created too many individualized issues [and] [r]ather, there is a reasonable probability the court would have reached a different

28  result based on this evidence," and accordingly the court of appeal remanded for further proceedings.

i.    Meal Periods

"The meal periods provided for under Section 512 . . .  may only be waived by mutual consent of both the employer and employee.."   Clark v. QG Printing II, LLC, No. 118CV00899AWIEPG, 2020 WL 5604290, at *15 (E.D. Cal. Sept. 18, 2020) (citations omitted). The California Labor Code provides that "[a]n employer shall not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes, except that if the total work period per day of the employee is no more than six hours, the meal period may be waived by mutual consent of both the employer and employee." Cal. Lab. Code § 512 subd. (a); see also 8 Cal. Code Regs. § 11010, subd. 11(A)-(B). Additionally, "[a]n employer shall not employ an employee for a work period of more than 10 hours per day without providing the employee with a second meal period of not less than 30 minutes, except that if the total hours worked is no more than 12 hours, the second meal period may be waived by mutual consent of the employer and the employee only if the first meal period was not waived." Id.; see also Clark, 2020 WL 5604290, at *15 ( ("The meal periods provided for under Section 512 . . .  may only be waived by mutual consent of both the employer and employee . . . [t]he first meal break . . . can only be waived for shifts 'no more than six hours,' and the second meal break can only be waived for shifts of 'no more than 12 hours' where the first meal break was not waived.") (quotation marks and citations omitted).

Here, Defendants' written meal period policy provided as follows:

> [The Company] also requires its employees to take a mandatory unpaid, uninterrupted meal break in accordance with California law (30-60 minutes per their arrangement with their supervisor). A meal break is an unpaid period when employees are relieved of all work duties and responsibilities, generally for the purpose of having a meal. All employees may leave the premises during meal breaks, if they choose to do so. Employees must clock out when taking a meal break and clock back in when they resume work. During the meal period break, employees may not perform any work-related activities.
>
> If non-exempt employees work more than five hours (5:01), they will be scheduled for one unpaid meal break, to begin no later than before the end of the fifth hour of work. However, if the time worked is between five hours and six hours, the meal period can be waived via written mutual consent between the employee and their supervisor. Non-exempt employees working more than 10 hours

1    (10:01) will be scheduled for a second meal break to begin no later
     than before the end of their tenth hour of work. Emp
2    and follow their assigned work schedule.

3   (Opp'n 7-8; Stahle Decl. ¶ 18, Ex. 2, ECF No. 82-2 at 87-89.)[9]  On March 20, 2017, the meal

4   period policy was amended to provide for meal periods of 35 minutes, rather than 30 minutes.

5   (ECF No. 82-2, at p. 91 ("All hourly (non-exempt) associates' meal breaks will be scheduled for a

6   duration of **35 minutes** to allow sufficient time for the minimum 30-minute meal break to occur,

7   and to assist associates from clocking in early") (emphasis in original).)

8        ii.    Rest Breaks

9        "An employer shall not require an employee to work during a meal or rest or recovery

10  period mandated pursuant to an applicable statute, or applicable regulation, standard, or order of

11  the Industrial Welfare Commission, the Occupational Safety and Health Standards Board, or the

12  Division of Occupational Safety and Health."  Cal. Lab. Code § 226.7(b).  "Employers are

13  required to 'authorize and permit' rest breaks, but rest breaks can be waived."  Clark, 2020 WL

14  5604290, at *16 (quoting Brinker, 53 Cal. 4th at 1033).  "If an employer fails to provide an

15  employee a meal or rest or recovery period  . . .  the employer shall pay the employee one

16  additional hour of pay at the employee's regular rate of compensation for each workday that the

17  meal or rest or recovery period is not provided."  Cal. Lab. Code § 226.7(c).

18       Defendants' written rest period policy provided as follows:

19       [The Company] provides non-exempt employees with 10-minute
         paid rest breaks as required by California law. Non-exempt
20       employees are authorized and permitted one rest break for each
         hour work period or a 'major fraction' of a work period (i.e., greater
21       than two hours); however, any non-exempt employee who works
         less than 3½ hours in a day is not eligible to take a rest break. The
22       number of breaks received is is follows:

23       Non-exempt employees who work between 3½ and 6 hours are
         entitled to one rest break. Non-exempt employees who work more
24       than 6 and up to 10 hours are entitled to two rest breaks. Non-
         exempt employees who work more than 10 and up to 12 hours are
25       entitled to three rest breaks.

26

27  [9]  Plaintiff attaches to the certification motion a "copy of Tenaya's California Meal and Rest Break Policy, which was
     attached as Exhibit 2 to the transcript of the Deposition of Defendant's Regional Human Resources Manager Debra
     Goehring under section 30(b)(6) of the Federal Rules of Civil Procedure."  (Stahle Decl. ¶ 18.)
28

> A rest break is paid time when you are relieved of all work duties and responsibilities. Rest breaks may not be combined, added to a meal period, or taken at the very beginning or very end of the day. Where practicable, rest breaks should be in the middle of each work period.
>
> Employees must self-police their rest breaks; they are not expected to and should not work during their rest breaks. Non-exempt employees are paid for all rest break periods. Accordingly, employees do not need to clock out when taking a rest break. If any employee is unable to take or complete their rest break time, the employee must notify their supervisor at the time the employee is unable to take or complete the rest break.

(Opp'n 8-9; ECF No. 82-2, at 88.)  Effective as of March 20, 2017, Defendants amended the rest break policy as follows:

> Tenaya Lodge meets its obligation to provide proper rest breaks, the following amendments to the Tenaya Lodge Rest Break policy will take effect **Monday, 3/20/17:**
>
> All hourly (non-exempt) associates are required to validate their rest break times on the rest break log sheets, as provided by the department management, in order to keep accurate timekeeping records and ensure that all associates are receiving their due rest breaks.
>
> All associates who are required to carry a radio or any other hotel communication device during their shifts will now be required to turn in such device as designated by management prior to departing the work area for their rest breaks, to ensure that the associate has been fully relieved of all duty.

(ECF No. 82-2 at 91.)

### e.  Plaintiff has not Established Commonality, Typicality, nor Predominance

Plaintiff argues the meal break claim presents common questions which predominate over any individualized issues.  Pina v. Con-Way Freight, Inc., No. C-10-00100-JW, 2012 WL 1278301, at *7 (N.D. Cal. Apr. 12, 2012) (certifying class where plaintiffs' evidence demonstrated "informal policies of discouraging the taking of breaks would likely be susceptible to common proof," including evidence that drivers "sought the permission of their supervisor before taking a meal break, and that such permission was given only after a shift's deliveries were completed").  Similarly, Plaintiff contends Defendants did not permit its employees to take rest breaks due to lack of coverage, or those rest breaks were interrupted by supervisors instructing employees to return to work before completing a full ten-minute rest break.  (Mot. 22–23.)

1    Plaintiff contends employees who did not take compliant rest breaks were subject to discipline;

2    thus, employees were discouraged from reporting short, missed, or interrupted rest breaks to

3    avoid discipline.  (Mot. 23.)

4          It is true as Plaintiff emphasizes that "employers do not escape liability simply by having

5    a formal policy of providing meal and rest breaks."  Boyd v. Bank of Am. Corp., 300 F.R.D. 431,

6    442 (C.D. Cal. 2014) (citations omitted).   However, "[p]roof an employer had knowledge of

7    employees working through meal periods will not alone subject the employer to liability for

8    premium pay; employees cannot manipulate the flexibility granted them by employers to use their

9    breaks as they see fit to generate such liability."  Brinker, 53 Cal. 4th at 1040.  "On the other

10   hand, an employer may not undermine a formal policy of providing meal breaks by pressuring

11   employees to perform their duties in ways that omit breaks."  Id.

12         Therefore for example, "even if an employer has a formal policy that is compliant with

13   California law, proof of an informal but common scheduling policy that makes taking breaks

14   extremely difficult, or other informal means of exerting pressure to discourage taking meal and

15   rest breaks, would be sufficient to establish liability to a class."  Brewer v. Gen. Nutrition Corp.,

16   No. 11-CV-3587 YGR, 2014 WL 5877695, at *7 (N.D. Cal. Nov. 12, 2014) (citing Brinker, 53

17   Cal. 4th at 1040); see also Alberts v. Aurora Behav. Health Care, 241 Cal. App. 4th 388, 406

18   (2015) (where plaintiffs alleged class members were routinely denied meal and rest breaks due to

19   understaffing, court of appeal reversed denial of certification as even assuming written meal and

20   rest break policy was "facially legal" and such "facial legality [was] undisputed by plaintiffs, the

21   mere existence of a lawful break policy will not defeat class certification in the face of actual

22   contravening policies and practices that, as a practical matter, undermine the written policy and

23   do not permit breaks."); Campbell v. Vitran Express Inc, No. CV 11-5029 RGK (SHX), 2015 WL

24   7176110, at *4 (C.D. Cal. Nov. 12, 2015) ("[E]mployer cannot contravene an official meal or rest

25   break policy by imposing an informal practice that impedes or discourages its employees from

26   taking compliant breaks." (citing Ricaldai v. U.S. Investigations Servs., LLC, 878 F.Supp.2d

27   1038, 1042 (C.D. Cal. 2012))).

28         Plaintiff argues employees were required to be relieved by supervisors to take their rest

22

breaks; and often were not permitted to take rest breaks because they were not relieved or provided coverage and were required to complete their work during their rest breaks; and employees often had rest breaks interrupted by supervisors instructing them to return to work before completing a full 10-minute rest break.  Plaintiff cites to 14 declarations here that the Court may consider.[10]

Plaintiff notes employees who are not provided compliant rest breaks are supposed to report it to their supervisor, and that because employees who do not take compliant breaks are subject to discipline, employees are discouraged from reporting short, missed, or interrupted rest

---

[10]  Although Plaintiff cited 18 declarations for this argument, the Court does not consider the declarations of Oviedo, Marquez, Diaz, or Southwood, as they were stricken.  (See ECF Nos. 99, 100.)  The Court excerpts some of the 14 declarations.  Here, for example, Plaintiff Vega declares that: "In my personal experience, and based on what I observed with other employees, the supervisors failed to permit us to take uninterrupted 10-minute rest breaks when we were understaffed and were assigned too many rooms to clean.  I could not take my rest breaks because my supervisor expected me to finish cleaning 17 to 20 rooms in an 8-hour shift without working overtime."  (Decl. Maria Socorro Vega Supp. Mot. ("Vega Decl.") ¶ 8, ECF No. 82-4 at 1.)  Miguel Arias declares in part, "my supervisors had to tell us when to take each rest break.  We were not permitted to decide for ourselves when or whether to take rest breaks. Those decisions were always made by our supervisors.  We took rest breaks when the supervisors told us to take a rest break.  We were not permitted to take a rest break unless and until a supervisor told us to take that specific rest break."  (Decl. Miguel Arias Supp. Mot. ("Arias Decl.") ¶ 8, ECF No. 82-5 at 1.)  Michael Davis declares: "On occasions when I was able to take a rest break, I was often called back to work by my supervisors before the end of my full 10-minute rest break because my supervisors called me back to work on my cell phone or the walkie- talkie, which I had to answer.  I estimate this occurred approximately three times per week at the beginning of my employment, but it escalated to approximately five times per week when I was promoted to manager on duty because there were not enough employees working and too much work needed to be done."  (Decl. Michael Davis Supp. Mot. ("Davis Decl.") ¶ 12, ECF No. 82-6 at 1.)  Tyler Haumann declares: "our supervisors often failed to provide us with a first or second 10-minute rest break approximately four to five days per week.  I rarely received rest breaks.  My supervisors did not provide me with rest breaks because it was often too busy or there were not enough employees working during the shift for me to take one.  I felt pressured to skip my first and second rest break because my supervisors assigned sections of guests to me and I was always busy tending to guest needs.  I never worked a shift of less than three and a half hours at Tenaya between February 2015 and March 2017."  (Decl. Tyler Haumann Supp. Mot. ("Haumann Decl.") ¶ 9, ECF No. 82-8.)  George Luck III declares that: "I was not permitted to take a meal period approximately 3-4 times per week.  On days when I worked over 10 hours, I was not permitted to take a second meal period approximately half of the time.  I worked over 10 hours in a shift approximately 5 to 6 times per week during the busy seasons."  (Decl. George Coleman Luck III Supp. Mot. ("Luck Decl.") ¶ 7, ECF No. 82-10.)  Randy Mejia states: "our supervisors often failed to provide us with a first 10-minute rest break, approximately five days per week.  When I worked a shift lasting longer than six hours, I was not provided with a second 10-minute rest break.  In fact, I did not know I was entitled to rest breaks because my supervisors never informed me of this right.  My supervisors never told me to take a rest break or asked if I took one."  (Decl. Randy Mejia Supp. Mot. ("Mejia Decl.") ¶ 8, ECF No. 82-12.)  Alexandria Rascon declares that: "On occasions when I was able to take a rest break, I was often called back to work by my supervisors before the end of my full 10-minute rest break because my supervisors would find me and say that they needed help and to come back to work. I estimate this occurred approximately ten times per month."  (Decl. Alexandria Rascon Supp. Mot. ("Rascon Decl.") ¶ 13, ECF No. 82-15.)  Gennica Scroggs declares that "my managers never permitted us to take rest breaks.  My managers would never tell us to take a break.  I never worked less than three and a half hours in a shift."  (Decl. Gennica Scroggs Supp. Mot. ("Scroggs Decl.") ¶ 10, ECF No. 82-16.)  Plaintiff's other declarations provide similar testimony.  (See Mot. 23.)

1    breaks to avoid discipline. In support, Plaintiff first cites the 30(b)(6) deposition testimony of

2    Defendants' Regional Human Resources Manager, and the following exchange:

3            Q. Are employees ever disciplined for recording a short meal
             break?

4

5            A. I believe that they can be if it's documented that there are
             repeated abuses and it's not accurate. That would be -- not be -- that

6            would be a falsification if they were continually punching in at 29
             minutes.  But we would absolutely, as a first result -- resort, be
             speaking to them to make sure they're aware of the requirement to

7            take a full 30 and, indeed, we want them to take up to 35 and never
             punch in early.

8

9            So we would -- we go over that in orientation. They sign a policy
             for that as well. And then our managers are always encouraged to

10           always tell them -- if they're seeing this happen, to ask them if there
             was a reason for it to make sure they're verifying that it wasn't an

11           interrupted break, and then make sure they're aware so they're set
             up for success what the expectations are.

12           So they cannot just say "I forgot when I punched out." They can
             verify when they punched out at the timekeeping system so it's not

13           a mistake. Right? But if there are continued abuses where we know
             they're not interrupted, they could potentially be written up.

14

15   (Goehring Dep. at 156:23-157:22.)  Plaintiff also directs the Court to this exchange:

16           Are you saying that only if they're not actually taking short meal
             breaks would they be written up?

17

18           []Objection; incomplete hypothetical; calls for speculation.

19           THE WITNESS: What I would say is with any policy, we always
             want to make sure our associates are following the policy. If we see

20           that there is a possible misunderstanding of the policy, our practice
             is to meet with the associate to find out if there's a -- a

21           misunderstanding about it.

22           If they have a thorough comprehension of the expectations and how
             their behavior may need to change moving forward or, in this

23           instance, as you bring up, if there is a 20 -- 29-minute break taken
             instead of a full 30, we would want to find out "Were you

24           interrupted? Was there a reason that you punched in at 29
             minutes?" and "Here is the expectation." Because they are told,

25           when they sign the policy, of the 30- to 35-minute break.

26           So it would be any policy -- we've continually used the word
             "abuse," but if they have

27           continual issues where they're not following the policy correctly,
             then they could perhaps be written up. And that would be any

28           policy we have, not just the meal and rest breaks.

(Goehring Dep. at 158:23-159:23.)   Regarding discipline, Plaintiff again points to declaration testimony, citing to 9 declarations here that the Court may consider.[11]   The Court discusses all competing declarations below in greater detail.

    i.    <u>Plaintiff's Expert Report and Donohue</u>

As relevant to certification generally, and specifically as to the <u>Donohue</u> presumption relating to the meal period class, Plaintiff has submitted an expert report of Nora Ostrove (ECF No. 82-3), proffering the "meal period violation rate was 29.93% in 2015-2021 and 43.22% in 2022" based on a sample of Defendants' time records.   (Mot. 19.)   Plaintiff argues these records

---

[11]  Although Plaintiff cited 12 declarations for this argument, the Court does not consider the declarations of Oviedo, Marquez, or Southwood, as they were stricken.   (See ECF Nos. 99, 100.)   The Court excerpts some of the 9 declarations.  Here, for example, Plaintiff Vega declares "I clocked out for my meal period and returned to work without taking my actual meal period or only taking a part of my meal period approximately one to two times per month because I was assigned too many rooms to clean for that shift and the supervisors did not relieve me for my meal period.  At the end of my shifts, I was required to answer whether I received my meal period and rest breaks in order to clock out for the day.  When I answered no or did not want to sign that I got my breaks, my supervisors disciplined me about not taking my break, but the reason I did not receive my breaks is because my supervisors assigned me too many rooms to clean in an eight-hour shift and had told me not to work overtime.  So, when I clock out for the day, I always answer yes or signed to having received a meal period and rest periods, even when I did not receive them." (Vega Decl. ¶ 7.)  Scroggs declares that: "On most days during my employment, I clocked out for my meal period and returned to work without taking my actual meal period because the restaurant was busy and there was no one to relieve me.  I was often told by a manager to clock out for my meal period, but because my tables were full and there was no coverage, I would immediately have to return to working or there would be no one taking care of the guests.  My managers saw me on the floor, so they were aware I was not actually taking a meal break." (Scroggs Decl. ¶ 9.)  Rascon declares that "My supervisor adjusted my time punches to indicate that I took a lunch before the fifth hour even when I was not provided a lunch until after my fifth hour of work.  At the end of my shifts, I am required to answer whether I received my meal period and rest breaks in order to clock out for the day.  When I answered no, my supervisor disciplined me and was passive aggressive to me, but the reason I did not receive my meal periods is because my supervisors did not relieve me.  So, when I clock out for the day, I always answer yes to having received a meal period and rest breaks, even when I did not receive them, to avoid conflicts with my supervisor." (Rascon Decl. ¶ 12.)  Ryan Murray declares that: "At the end of my shifts, I was required to answer whether I received my meal period and rest breaks in order to clock out for the day.  When I answered no, my supervisors threatened to write me up for not taking my breaks and said it was my fault, but the reason I did not receive my breaks is because my supervisors did not give me permission to take them.  As a result, when I clocked out for the day, I had to answer yes to having received my breaks to avoid getting in trouble, even when I was not provided my breaks, and my supervisors were aware of this." (Decl. Ryan Murray ("Murray Decl." ¶ 8, ECF No. 82-13.)  Haumann declares: "At least three days per week during my employment from February 2015 to approximately March 2017, I clocked out for my meal period and returned to work without taking my actual meal period because the restaurant was busy and the supervisors did not relieve me for my meal period.  I would set an alarm clock on my cell phone to remind me when to clock back in.  If I did not clock out, I would get written up or my supervisor would enter in a meal break for me or tell me to sign a meal break waiver form. (Haumann Decl. ¶ 8.)  Davis declares that: 9.  When I was promoted to manager on duty, my supervisor told me that I was supposed to work eight-hour shifts without a break and that I would get premium pay. Per my supervisor s instructions, I did not clock in or out for my meal breaks and worked through my meal breaks. However, when human resources saw that I was not clocking in or out for meal breaks, I was reprimanded. I told the human resources representative I did not get meal breaks because my supervisor told me not to take them. The human resources employee said  you were not that busy, and I do not believe I was paid the premium pay. I do not recall seeing any premium pay on my pay stubs. (Davis Decl. ¶ 9.)  Plaintiff's other declarations provide similar testimony.  (See Mot. 23.)

are sufficient to proceed to certification.  Defendants respond that even based on Plaintiff's "so-called" violation percentages, the evidence shows that over half the shifts have fully-compliant meal periods, and this cannot support classwide harm, as courts have routinely denied certification with evidence of much higher violation rates.

Defendants also proffer that more importantly, the expert report "is utterly useless, because the expert admits that there is no way to determine the reasons why employees did not take meal periods, whether, as a voluntary decision or an involuntary decision."  (Opp'n 27.) Defendants highlight the expert deposition, where Ostrofe answered "[c]orrect," when asked: "You're not able from looking at the time punches in the random sample to determine whether a noncompliant meal period was voluntary or involuntary; correct?"  (Ostrofe Dep. at 54:15-18, 21.)  Defendants also proffer the expert admits "there is no way to determine whether an employee lawfully waived a meal period."  (Ostrofe Dep. at 82:5-9 ("Q And did you look at whether any of the employees in the random sample had waived their meal periods? A I did not. I was not asked to address waivers.").)  Defendants argue the expert admits the report does not account for whether employees received "premium pay" for meal period violations.  (Ostrofe Dep. at 64:4-9, 12-13 ("Q And the random sample shows the instances of premium pay being provided to employees; right? A Yes, it does. Q And did you in preparing your damages analysis back out any of those instances where premium pay had already been provided? A No, because I was not asked to address premiums.").)

Defendants argue the expert report does not address the validity of employee attestations stating that meal and rest periods were provided.  (Ostrofe Dep. at 80:1-4; 7-9 ("Q You're not qualified in order to determine whether any of these attestations provide by any employee for any shift are truthful; correct? A The validity of the attestations is not an area of my expertise, and it's also outside the scope of my work.").)  Finally, Defendant notes that Plaintiff's expert also explained that her calculations assumed that a rest period violation occurred in every shift that was eligible for a rest period, without regard to whether rest periods were taken or not.  (Ostrofe Dep. at 40: 21-25 ("Q [W]ith respect to your rest period analysis, you looked to see if an employee worked the required number of hours to be eligible for a rest period; correct? A

Correct."); id. at 49:12-17 ("Q You don't know for any of the time records that you looked at, presuming somebody was working enough eligible hours for a rest period, you don't know if they actually received that rest period; correct? A That's correct.").)

Some of the Defendants' arguments have merit in responding to the method and scope of the expert's analysis and report, however, Defendants did not retain their own expert or rebuttal report, and based on the Court's review, the expert's answers at deposition appear reasonable as to method and scope.  However, of course, the limited scope goes to the Court's consideration of various factors and whether Defendants have rebutted the report.  The Court finds perhaps most significant of Defendant's pointed attacks, that the expert assumed a rest period violation occurred in every shift that was eligible, without a determination whether rest periods were taken.

However, even accepting Plaintiff's violation rate as an "accurate representation,' the Court finds, as explained at various points in these findings below, that Defendants have demonstrated there are "numerous individualized reasons why a putative class member may not have taken a compliant meal break," and Plaintiff "has failed to provide this Court with evidence allowing it to conclude that the reason underlying a meal break was common to the class." Castillo v. Bank of Am. Nat'l Ass'n, No. SACV170580DOCKESX, 2019 WL 3818954, at *10 (C.D. Cal. July 16, 2019) ("Plaintiff points to its expert's contention that '30.3' of the timekeeping records he sampled showed a meal break 'violation[,]' [however] [r]egardless of whether this is an accurate representation . . . Plaintiff has [not] put forth any evidence of a common policy or a common reason why a putative class member may not have taken a complaint meal break."), aff'd sub nom. Castillo v. Bank of Am., NA, 980 F.3d 723 (9th Cir. 2020); Rojas-Cifuentes v. ACX Pac. Nw. Inc., No. 214CV00697JAMCKD, 2018 WL 2264264, at *6 (E.D. Cal. May 17, 2018) ("While Plaintiff cites employee time records showing 61.1% of Wilmington employee shifts have short, late, or missing meal periods, this only shows potentially problematic meal periods for some employees . . . showing that some employees may have been deprived of an opportunity to take an uninterrupted meal break does not amount to a 'policy and practice capable of determining [Defendants'] liability on a class-wide basis.' " (quoting Ordonez, 2013 WL 210223, at *7)); Lampe v. Queen of the Valley Med. Ctr., 19 Cal. App. 5th

832, 851, 228 Cal. Rptr. 3d 279, 293–94 (2018) (where expert showed that only 11.1 percent of employees took compliant meal breaks within first 5 hours, while plaintiff argued this is evidence that employer uniformly failed to provide timely meal breaks, court found "this could easily be explained by waivers . . . [and affirmed noting] [t]o determine why each employee did not take their first meal break after five hours would require an individualized determination and review of individual employee files and pay stubs . . . court correctly concluded that common issues did not predominate and given the individualized inquiries required and the potential conflict between the named plaintiffs and the class.") (citations and quotation marks omitted).

The Court finds the expert's report is of limited value because the "key question is not necessarily whether an employee took a timely break but *why* the employee did not take a timely break." Rivera v. Ryder Integrated Logistics, Inc., No. CV 22-267-GW-EX, 2022 WL 18337695, at *10 (C.D. Cal. Dec. 27, 2022) (quoting Manigo v. Time Warner Cable, Inc., No. 216CV06722JFWPLAX, 2017 WL 5149225, at *4 (C.D. Cal. Apr. 4, 2017) (emphasis in original); Washington v. Joe's Crab Shack, 271 F.R.D. 629, 641 (N.D. Cal. 2010) ("In addition, plaintiff's suggested solution of simply examining time records to determine when meal breaks were not taken would be unavailing, as that would not answer the question why the employees did not take breaks . . . not only would individualized analyses have to be performed to determine whether or when employees were eligible for breaks and did not take them, but the analyses into why the breaks were not taken would require the parties to delve into each employee's personal preference, whether a breaker was available, how busy the restaurant was, and whether Crab Addison did or did not pay for the missed break (as it did on at least five occasions for plaintiff).").

In Sultan, the plaintiff in their moving papers identified the only outstanding issue as "why the employee failed to take their break." Sultan v. Medtronic, Inc., No. CV 11-4132-MWF PLAX, 2012 WL 3042212, at *2 (C.D. Cal. July 23, 2012). The district court, noted that "[t]he reasons that employees fail to take breaks can be manifold: the employees could have forgotten, wanted to finish assignments, were not hungry, did not want to leave the premises, wanted to leave early or, possibly, were manipulating their timecards," and found plaintiff had identified

"no sources of common proof or common testimony on the question of why breaks were not taken beyond pointing to the operative meal break policy," found that "[a]s a result, liability and not merely damages will need to be determined on an individualized basis," and held that "[w]ithout pointing to common questions or proof, the proposed class fails to satisfy Rule 23(a)'s commonality requirement." Sultan, 2012 WL 3042212, at *2.

Many courts have found that in determining whether to grant certification, "the crucial issue with regard to the meal break claim is the reason that a particular employee may have failed to take a meal break." Guinn v. Sugar Transp. of the Nw., Inc., No. CV 2:16-325 WBS EFB, 2017 WL 6513306, at *6 (E.D. Cal. Dec. 20, 2017) (quoting Washington, 271 F.R.D. at 641). Therefore, "[i]n the absence of any common policy, an individualized inquiry will be required to determine whether any single employee failed to take a meal break," and why any employee failed to take a meal break. Guinn, 2017 WL 6513306, at *6 (quoting Washington, 271 F.R.D. at 641); see also Jimenez v. Allstate Ins. Co., No. LA CV10-08486 JAK, 2012 WL 1366052, at *15 (C.D. Cal. Apr. 18, 2012) ("Plaintiff has not identified any common policy or practice that interfered with adjusters' ability to take breaks other than his generic allegations that adjusters were overworked and did not have time for such breaks . . . allegations [] not sufficient to demonstrate affirmatively that common questions exist or will predominate [and] [i]nstead, the success of Plaintiff's claims will depend on individualized questions, such as whether a particular adjuster took the legally mandated breaks, and if breaks were missed, why the adjuster failed to take them."), aff'd, 765 F.3d 1161 (9th Cir. 2014); Dukes, 564 U.S. at 350 ("That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.").

The Court finds, as supported by additional analysis below, even recognizing and applying the Donohue presumption as flowing from the basic findings of the Plaintiff's expert report, that instances where time records show a non-compliant meal period would require individualized inquires. Rivera, 2022 WL 18337695, at *10 ("However, '[e]mployers can rebut the presumption by presenting evidence that employees were compensated for noncompliant meal

periods or that they had in fact been provided compliant meal periods during which they chose to work . . [and] <u>Donohue</u> recognized that an 'employer may rebut the presumption with evidence of bona fide relief from duty,' such as an attestation system where 'employees [could] indicate whether they were provided a compliant meal period but chose to work.' " (quoting <u>Donohue</u>, 11 Cal. 5th at 77-78)); <u>Guinn</u>, 2017 WL 6513306, at *6 ("[P]laintiff has not identified a specific policy that precluded the drivers from taking a break . . .to the contrary, Sugar Transport had a policy that required its drivers to take their lawful breaks and shared this policy with drivers through written notices, verbal discussions, and posted wage orders [and] [a]ccordingly, the determination of whether a break was missed, and why, would involve an individual analysis into the daily behavior of each particular driver."); <u>Gonzalez v. Millard Mall Servs., Inc.</u>, 281 F.R.D. 455, 462 (S.D. Cal. 2012) ("Similar to the facts in <u>Dukes</u>, Millard had a meal and rest period policy conforming to the applicable laws and wage orders . . . addition[ally], the Project Managers at each location have discretion in scheduling the employees' work schedule and meal and rest periods . . . [t]herefore, Plaintiffs have not shown that there was a common policy that pervaded the entire company where Project Managers prevented employees from taking meal breaks and did not authorize and permit employees to take rest breaks.").

Considering Rule 23(b)(3) specifically, for the reasons explained herein at various points, the Court finds individualized questions regarding whether and why meal and rest breaks were missed or not provided, would predominate over questions common to class members, and thus class certification should be denied. See Fed. R. Civ. P. 23(b)(3); <u>Alcantar v. Hobart Serv.</u>, 800 F.3d 1047, 1054 (9th Cir. 2015) (affirming district court's holding that "even if the class met Rule 23(a)'s prerequisites, the class would still fail under Rule 23(b)(3) because questions as to why service technicians missed their meal and rest breaks, whether because of their employer's failure to provide them or their own choice to forgo them, would predominate over questions common to the class," as a "conclusion [] well within; the district court's discretion.")[12]; <u>Castillo</u>, 2019 WL

---

[12]  Like here, there were competing declarations in <u>Alcantar</u>: "Plaintiff offered declarations from employees as evidence that no one ever took any action to relieve the employees of all of their duties for their meal periods . . . Defendants have provided declarations from branch managers detailing that employees were required to keep accurate time records and advise their branch manager if they were unable to take a required meal period."  <u>Alcantar v. Hobart Serv.</u>, No. ED CV 11-1600 PSG, 2012 WL 5946129, at *4–5 (C.D. Cal. Nov. 28, 2012), <u>aff'd</u>, 800 F.3d

3818954, at *14 ("That the data may show instances of employees not taking meal periods, without more, does not demonstrate that they are owed meal period premiums or whether [employer] failed to pay them [and thus] [i]ndividual questions of fact predominate [and] [c]lass certification as to this claim is not proper based on this requirement alone.").

Similar to the allegations here, in <u>Flores</u>, the plaintiff "claimed that although her employer's written meal and rest break policies were facially lawful, the demeanor of some supervisors implicitly compelled employees to forego or interrupt breaks to help customers." <u>Flores v. Supervalu, Inc.</u>, 509 F. App'x 593, 594 (9th Cir. 2013).  The Ninth Circuit affirmed a denial of certification finding "[t]he district court district court correctly found that this claim required examination of 'a number of human factors and individual idiosyncrasies' having 'little to do with an overarching policy,' and thus failed to satisfy Rule 23(b)(3)." <u>Flores</u>, 509 F. App'x at 594 (citing <u>In re Wells Fargo Home Mortg. Overtime Pay Litig.</u>, 571 F.3d 953, 959 (9th Cir. 2009) (reversing grant of certification and noting certification may be denied when "a fact-intensive inquiry into each potential plaintiff's employment situation" is required)).[13]

The Ninth Circuit also rejected "Flores's claim that the district court abused its discretion in disallowing statistical studies and surveys . . . because the district court could reasonably conclude that in light of the idiosyncratic conduct Flores described, Flores could not prove the employer's liability through extrapolation from statistics." <u>Flores</u>, 509 F. App'x at 594.  While the Court is not disallowing statistical studies and surveys like <u>Flores</u>, and indeed proceeds under the assumption the <u>Donohue</u> presumption is applicable, the Court finds herein that given the distinct and individualized conduct described by Vega, for example smoke break testimony described below, and taking into account the transfer of burden under California law, the

---

1047 (9th Cir. 2015).  Additionally there, "Plaintiff admits that it has always been common sense for him to keep time records, that he has been disciplined for failing to keep such records, and that in his 18 years of employment, he has never advised a branch manager that he was unable to take a meal period." <u>Id.</u>  The trial court concluded that "[e]ven if Plaintiff's evidence established an unofficial policy of failing to provide employees with their meal and rest breaks, these issues are inappropriate for class certification because under Federal Rule of Civil Procedure 23(b), individualized questions would predominate as to whether employees worked "off-the-clock.' " <u>Id.</u>

[13]  In <u>In Re Wells Fargo</u>, the Ninth Circuit's statement was referring to the "federal outside salesperson exemption," where the employee is "customarily and regularly away from the employer's place of … business."  571 F.3d at 959 (quoting 29 C.F.R. § 541.500(a)).

Defendants have rebutted the presumption, and while they have not provided their own expert or statistical analysis, have adequately proved the statistical studies as submitted cannot support class treatment here, through extrapolation from the statistics as presented in such form, in relation to the competing declaration testimony.

Plaintiff in reply, argue Defendants rely on cases decided prior to Donohue and misrepresent the holding in Donohue.  See Garcia, 2022 WL 657972, at *6 (noting Donohue "held that the presumption applies to both the summary judgment and class certification stages," and noting "courts have applied the Donohue presumption when assessing class certification motions.").  Plaintiff also argues Defendants have not explained how they will rebut the Donohue presumption or why rebutting it would raise predominating individual issues.  Duran v. U.S. Bank National Assn., 59 Cal.4th 1, 38 (2014) (The employer does not have a "due process right to litigate an affirmative defense as to each individual class member.").  Plaintiff argues Defendants do not dispute the accuracy of Plaintiff's expert's analysis of the data and did not retain their own expert witness or present their own data analysis.  In this regard, Defendants acknowledge Donohue, (Opp'n 28), and the Court considers all relevant caselaw and arguments.  Although cases may have been decided before Donohue, the Court does not find the burden shifting analysis there necessarily means principles relied on in earlier cases are no longer relevant or applicable to analyzing whether the presumption has been rebutted.  Further, as discussed above, Defendants do address the expert analysis (Opp'n 27), though it is accurate Defendants did not provide a direct rebuttal expert report.

Plaintiff also emphasizes that time records showing noncompliant meal periods provide a common means of establishing liability.  See Estrada, 76 Cal. App. 5th at 723–24 ("The burden would then have shifted to [employer] to show that plaintiffs were provided with compliant meal periods but chose to work instead . . . [and] [i]t then follows that the burden would have been on [employer], not plaintiffs, to show individual issues predominated.").  Plaintiff moreover argues the question of whether Defendants paid meal break premiums for noncompliant meal breaks can be established based on common evidence—namely, analysis of Defendants' time and payroll data.  See Santillan v. Verizon Connect, Inc., No. 3:21-CV-1257-H-KSC, 2022 WL 4596574, at

*13 (S.D. Cal. June 13, 2022) ("Verizon's evidence in support of its affirmative defense includes: (i) its meal period policies, (ii) timekeeping procedures . . .Verizon's policies and timekeeping system are common to the class . . . [and] [t]hus, this evidence may be considered on a classwide basis.").

While Plaintiffs cite to <u>Garcia</u> for that court's application of the <u>Donohue</u> presumption, there, the defendants' own rebuttal expert provided a figure sufficient enough for the presumption to apply. <u>Garcia</u>, 2022 WL 657972, at *6. Specifically, Garcia's expert's report included a figure that "100,772 shifts greater than five hours had no recorded meal period, or a meal period that was short or late, amounting to 18.64% of all shifts of that length." <u>Id.</u> There, "Defendants' expert provide[d] a slightly lower estimate, 17.04% of that same metric," and the court found that "[e]ven taking Defendants' lower estimate as true, that records show 17% of shifts show a possible meal period violation is sufficient to invoke the presumption from <u>Donohue</u>." <u>Id.</u> The <u>Garcia</u> court then found the defendants' effort to rebut the presumption was insufficient, where they presented "five declarations from current employees who say that when they did not take their meal periods that was their choice, or they received appropriate compensation for the missed meal period." <u>Id.</u> Those declarants' "[r]easons for not taking a meal period or rest break included a preference to keep working through the break, concerns about losing energy, or not having anyone to cover for them when the restaurant is busy." <u>Id.</u> Noting <u>Donohue</u> allows employers to rebut through representative testimony, surveys, statistical analysis, and other types of evidence, the court found "five such declarations, when considering the thousands of potential members of the proposed class, can hardly be considered representative and are insufficient to rebut the Donohue presumption at this time." <u>Id.</u> The court additionally expressed skepticism given the declarations all came from current employees, noting potential "risk of bias and coercion inherent in such testimony." <u>Id.</u> at n.4 (quoting <u>Shaw v. AMN Healthcare, Inc.</u>, 326 F.R.D. 247, 269 (N.D. Cal. 2018)). The Court finds <u>Garcia</u> distinguishable here. For the reasons explained herein, the Court finds Defendants' declarations submitted here, have, in part and in conjunction with other evidence and arguments, rebutted the presumption. The Court further details such declarations and arguments below.

Plaintiff argues nevertheless that she has presented substantial evidence that inadequate staffing levels led to widespread meal break violations, as evidenced by Defendants' timekeeping records.  See Alberts, 241 Cal. App. 4th at 412 (finding trial court "erred in refusing to consider statistical evidence" where plaintiffs' expert's declaration "was offered to show that the [employer]'s timekeeping and payroll data confirmed plaintiffs' theory that classwide policies led to the denial of meal breaks for putative class members," as the expert was not tasked or required to reach ultimate issue of "whether the [employer]'s informal policy caused classwide deprivation of meal breaks" or "whether employees actually received lawful meal breaks.")  Plaintiff alleges Defendants' widespread understaffing practices and the requirement through March 20, 2017, that employees carry walkie-talkies and keep them on during meal breaks deprived non-exempt employees of duty-free and uninterrupted meal periods, and while Defendants dispute the specific provisions of these policies, Plaintiff contends "[t]he existence of such a policy is a factual question that is common to all class members and is amenable to class treatment."  Jones v. Farmers Ins. Exch., 221 Cal. App. 4th 986, 996 (2013).

In Jones, the plaintiffs' "theory of recovery [was] that Farmers applied a uniform policy to all putative class members denying them compensation for 'computer sync time' work performed at home before the beginning of their scheduled shifts," and found "[w]hether such a policy, if it exists, deprives employees of compensation for work for which they are entitled to compensation is a legal question that is common to all class members and is amenable to class treatment."  Id. ("Claims alleging that a uniform policy consistently applied to a group of employees is in violation of the wage and hour laws are of the sort routinely, and properly, found suitable for class treatment." (quoting Brinker, 53 Cal.4th at 1033)).  The Court finds the computation and universal application of "computer sync time" to be distinguishable from, for example, the individualized inquiries regarding missed meal and rest periods, as demonstrated and discussed below when reviewing the competing declarations.

Plaintiff contends that whether employees waived their meal breaks is a question subject to common proof as "an employer's assertion that an employee waived a meal period 'is not an element that a plaintiff must disprove as part of the plaintiff's case-in-chief[,]' . . . [but] [i]nstead,

the assertion is 'an affirmative defense,' and 'the burden is on the employer, as the party asserting waiver, to plead and prove it.' "  Donohue, 11 Cal.5th at 75-76 (quoting Brinker, 53 Cal.4th at 1053).   Accordingly, Plaintiff argues the validity of Defendants' waiver policies presents a common legal question supporting certification.   See Clark, 2020 WL 5604290, at *16 ("[D]eterminations as to the validity of QG Printing's prospective waivers…will drive resolution of most—if not all—claims" for waiver subclass).

In Clark, "[d]ata set forth by Plaintiff's expert show that there was no first meal break on 85% of shifts greater than five but less than six hours in length and no second meal break on 99.5% of shifts greater than 10 hours but less than 12 hours in length."  Id.  However, "there [was] no dispute that prospective waivers executed at the commencement of employment were used extensively in connection with first meal breaks on shifts of six hours or less and second meal breaks on shifts of 12 hours or less [and] [g]iven these facts, [the court found] it appears that determinations as to the validity of QG Printing's prospective waivers and QG Printing's failure to provide premium pay automatically will drive resolution of most—if not all—claims for the Meal Break Waiver Subclass and that any individualized inquiries would pertain primarily to damages (based on the number of meal breaks missed based on invalid waivers and the amount of premium payment improperly withheld)."  Id.  The court found commonality and predominance, relying on Brinker's statement that "[c]laims alleging that a uniform policy consistently applied to a group of employees is in violation of the wage and hour laws are of the sort routinely, and properly, found suitable for class treatment."  Id. (quoting Brinker, 53 Cal. 4th at 1033).  The Court finds the case distinguishable here given in Clark it was undisputed that the prospective waiver caused much of the violations and thus it was only left to determine the amount of violations and damages, and thus class treatment was appropriate.  The Court finds damages are not the only outstanding individualized issue, as the Court discusses herein multiple points.

For the above reasons, and additional reasons explained below, the Court finds Plaintiff has not established commonality, nor predominance.  See, e.g., Guzman-Lopez v. Am. Bottling Co., No. 2:19-CV-04358-R-GJS, 2020 WL 913088, at *6 (C.D. Cal. Jan. 6, 2020) ("[A] classwide proceeding would not accomplish Rule 23(a)'s aim of generating a common answer

and resolving the central issue of Defendant's liability in 'one stroke,' . . . Plaintiff failed to identify a uniform policy . . . Defendants have submitted numerous declarations which contradict Plaintiff's unfounded assertion that this was a common practice . . . [n]ot only has Plaintiff failed to establish commonality warranting certification, but Defendants' declarations and policies submitted in opposition to the Motion effectively rebut the existence of actionable common policies and practices that might give rise to common issues capable of classwide resolution." (quoting Dukes, 564 U.S. at 350)).

### ii. Second meal period Subclass

The Court discusses the second meal period subclass briefly.  Plaintiff alleges Defendants failed to provide a second meal period after 10 hours of work and she seeks class certification of a "second meal period subclass."  Defendants respond the allegations are not supported by the testimony of either the named class representatives.  As noted above, previous plaintiff class representative Perez was dismissed from the case.

Plaintiff Vega is the only named class representative existing at this time.  Defendants proffer she testified that she never worked a shift of 10 hours or more, and, therefore, never qualified for a second meal period:

> Q Did you ever work a shift where you worked more than 10 hours in one day?
>
> A No.

(Dep. Maria Socorro Vega ("Vega Dep.") at 92:20-23, Ex. C, ECF No. 102-1 at 21.)  Plaintiff does not address this testimony in reply.  The Court agrees with Defendants that therefore, Plaintiff cannot meet the burden to satisfy the typicality requirement as to claims for violation of a second meal period.

### iii. Additional Discussion of Rest Breaks

As noted above, the Donohue presumption does not apply to rest breaks.  The Court turns to additional pointed discussion as to the rest break claims, and independent reasons those should not be certified either, considering the arguments and cases presented by the parties.

Plaintiff does not argue that Defendants' rest break policies listed above are facially

unlawful.  However, Plaintiff argues that whether Defendants' common practice of requiring employees to be relieved by supervisors to take their rest breaks complies with Defendants' obligation to "authorize and permit" rest breaks is a question common to all class members.  See Briggs v. OS Rest. Servs., LLC, No. LACV1808457JAKAFMX, 2020 WL 6260001, at *17–18 (C.D. Cal. Aug. 26, 2020) (finding that "whether class members were routinely denied rest breaks as a result of [d]efendants' policy and practice of requiring employees to obtain authorization from their managers to take such breaks" presented common questions); Alberts, 241 Cal. App. 4th at 406 ("mere existence of a lawful break policy will not defeat class certification in the face of actual contravening policies and practices that, as a practical matter, undermine the written policy and do not permit breaks.").  Plaintiffs argue that while Defendants dispute that employees needed permission to take breaks, whether or not permission was required is a common factual question supporting certification.  Jones, 221 Cal.App.4th at 996.

In Briggs, the "theory of liability center[ed] on whether putative class members were routinely denied rest breaks as a result of [the employer's] policy and practice of requiring employees to obtain authorization from their managers to take such breaks."  2020 WL 6260001, at *17 ("At the heart of Plaintiffs' claim is the 'policy-to-violate-the-policy,' a theory of liability recognized by the Ninth Circuit." (quoting Jimenez, 765 F.3d at 1166)).  The Briggs court noted the Jimenez "court held that the common question of whether [the defendant] had an 'unofficial policy' of denying overtime payments while requiring overtime work predominated over any individualized issues regarding the specific amount of damages a particular class member may be able to prove," and that the Ninth Circuit, in affirming, found that "[p]roving at trial whether such informal or unofficial policies existed will drive the resolution of [the overtime issue]."  Briggs, 2020 WL 6260001, at *17 (citing Jimenez, 765 F.3d at 1166).

However, as the Briggs court also noted, "[c]lass certification is not appropriate simply because a plaintiff alleges that a defendant had an unofficial policy to violate wage-and-hour laws."  Briggs, 2020 WL 6260001, at *17 (citing Flores, 509 F. App'x 593).  As the Briggs court acknowledged, the "claim in Flores mirrored the claim in Jimenez insofar as the allegations in both cases centered on an employer's alleged, unofficial policy to violate the Labor Code [but]

[d]espite this facial similarity, the two cases resulted in different determinations on the question of predominance." Briggs, 2020 WL 6260001, at *17.

First, "[i]n Flores, '[t]he district court correctly found that [the unofficial policy] claim required examination of a number of human factors and individual idiosyncrasies having little to do with an overarching policy, and thus failed to satisfy Rule 23(b)(3).' " Id. (quoting Flores, 509 F. App'x at 594)). "[T]he distinction between Jimenez and Flores 'appears to be the amount of evidence presented to support the existence of an unofficial policy [or] [i]n other words, common issues predominate in those cases where the plaintiff proffers sufficient evidence to demonstrate that an unofficial policy exists and applies uniformly to all class members.' " Briggs, 2020 WL 6260001, at *17 (quoting Campbell, 2015 WL 7176110, at *4). Courts "generally hold that sufficient evidence of an unofficial policy exists where the plaintiff offers multiple declarations from employees attesting to the uniform application of the policy." Id. "In contrast, 'courts have found insufficient evidence of a uniform policy where employees provide testimony indicating that their experiences varied based on supervisor or work location.' " Id. ("Ultimately, Campbell certified the proposed class, finding common questions predominated based on declarations by 15 employees of a putative class of 156 drivers [with] declarations [] deemed sufficient evidence to show a basis for the claim that the employer implemented and uniformly applied an unofficial policy of denying meal and rest breaks."). In contrast, Plaintiff's claims are supported here by less than 15 declarations for a class of more than 1,500, and are faced by more than twice as many competing declarations submitted by Defendants, as discussed below.

In Briggs, the court found sufficient evidence to support finding the common issue of whether there was an unofficial policy to deny rest breaks, predominated over individual issues, with such evidence as follows: "In addition to the PowerPoint presentation and follow-up e-mail provided to Fleming's L.A. Live employees, Plaintiff has presented declarations from employees who worked at seven of the 14 Fleming's locations in California [and] [e]ach declares that he or she did not receive or take rest breaks 'because the Manager on Duty did not approve them.' " 2020 WL 6260001, at *18. The Briggs court additionally noted that the defendants'' evidence could be interpreted to support at least one aspect of this claim, with that defendants' evidence

stating: "[e]mployees understand that, when they would like to take a rest break, they need only ask their manager to coordinate taking the rest breaks." Id.

Like here, the defendants in Briggs provided declarations, and not an insignificant amount, having "submitted declarations from 61 Fleming's employees who state that they 'have not been told they cannot take a rest break' and that they 'feel they have had the opportunity to take all rest breaks to which they were entitled.' " Id. The defendants there also argued that the competing evidence meant "what any particular employee claims to have experience, presents an individualized issue that is inappropriate for resolution on a class-wide basis," but the court instead found such "argument is one that can be tested at a trial as part of the determination whether there was an unofficial policy to deny rest breaks that was implemented." Id. (citing Jimenez, 765 F.3d at 1166 n.5).

While Briggs is supportive of Plaintiff's arguments in many regards, the Court declines to adopt the case as applied to the totality of the facts, claims, and evidence here. The Court finds the situation more akin to the cases that Briggs found distinguishable, for the reasons explained throughout these findings. See Briggs, 2020 WL 6260001, at *18 ("These cases are distinguishable [as] [i]n Washington and Madrigal, individualized inquiries predominated because there was no evidence of a common policy . . . [h]ere, Plaintiffs have presented some evidence to support the claimed unofficial uniform policy to deny rest breaks.").

iv.     Delineation of Liability and Damages

The Court turns to caselaw relating to where courts decided whether issues were isolated to calculation of damages and thus amenable to class treatment, versus those with individualized issues of determining liability.

In reply, Plaintiff cites Faulkinbury for that court's statement that an employer's liability arises by adopting uniform policies and practices which impede employees' access to breaks, and "[w]hether or not the employee was able to take the required break goes to damages." Faulkinbury v. Boyd & Assocs., Inc., 216 Cal. App. 4th 220, 235 (2013). But in Faulkinbury the plaintiff had established a uniform policy that was unlawful, and thus liability flowed therefrom pursuant to Brinker, irrespective of whether it actually failed to provide the break. Id. ("In

Faulkinbury I, we concluded that even if Boyd's on-duty meal break policy was unlawful, Boyd would be liable only when it actually failed to provide a required off-duty meal break[, however,] Brinker leads us now to conclude Boyd would be liable upon a determination that Boyd's uniform on-duty meal break policy was unlawful." (citing Brinker, 53 Cal.4th at 1033)).   The court noted that under Brinker, an "employer is required to permit and authorize the required rest breaks, and if it adopts a uniform policy that does not do so, then 'it has violated the wage order and is liable[,]' [or] [i]n other words, the employer's liability arises by adopting a uniform policy that violates the wage and hour laws [and] [w]hether or not the employee was able to take the required break goes to damages, and '[t]he fact that individual [employees] may have different *damages* does not require denial of the class certification motion.' " Faulkinbury, 216 Cal. App. 4th at 235 (first quoting Brinker, 53 Cal.4th at 1033, then quoting Jaimez v. Daiohs USA, Inc., 181 Cal. App. 4th 1286, 1301 (2010) (emphasis in original)).   Thus, the Court finds Faulkinbury distinguishable from the facts and evidence here, and finds liability has not been demonstrated as to the class, but rather requires individualized issues.

Plaintiff also cites Lubin in reply for its statement that "anecdotal evidence that some employees had valid off-duty rest breaks does not preclude class certification; rather, it is evidence that is relevant to damages." Lubin v. The Wackenhut Corp., 5 Cal. App. 5th 926, 956, (2016).   However, like Faulkinbury, the court had already found the plaintiff had demonstrated the existence of a policy or practice.   See id. (noting Faulkinbury's reliance on Brinker's liability/damages analysis where a uniform policy is in place, and stating "[s]imilarly, because the trial court in this case found that plaintiffs had made a showing that Wackenhut had a policy or practice of not providing off-duty rest breaks, anecdotal evidence that some employees had valid off-duty rest breaks does not preclude class certification; rather, it is evidence that is relevant to damages." (quoting Faulkinbury, 216 Cal. App. 4th at 237)).

v.      Named Plaintiff Deposition Testimony

The Court turns now to discuss the deposition testimony of the previous and current named Plaintiffs.   Defendant emphasizes the initial named Plaintiff in this matter, David Perez, admitted at his deposition that he was always provided with meal and rest breaks:

1   Q· · And you were scheduled to take 30-minute meal periods during your workdays that lasted more than five hours, correct?

2

3   A· · Correct.

    Q· · And you took your 30-minute meal periods throughout your
4   employment, correct?

5   A· · Yeah, correct.

6
(Dep. David Perez ("Perez Dep.") at 23:4-13, ECF No. 102-1 at 16.)   Defendant emphasizes
7
Perez further admitted that his meal periods were timely, because they were always taken before
8
the end of his fifth hour of work:
9
    Q· · You were schedule[d] to take a meal period before the end of
10       your fifth hour, correct?

11   A· · Correct and my manager would, he'd come up, it's time to take
        your lunch, he'd let me know because it gets pretty busy I don't
12       have a clock right there so

13   Q· · So sometimes you forgot, correct?

14   A· · Oh, yeah.

15   Q· · And if you forgot and the manager was aware he'd remind
        you, correct?
16
    A· · Correct.
17
(Perez Dep. at 25:20-26:5.)  Perez further testified that he took rest breaks if he worked 3.5 hours,
18
per Defendants' policies:
19
    Q· · And you also had the opportunity to take rest breaks during
20       your day, correct?

21   A· · Correct.

22   Q· · And you understood that was the company policy, correct?

23   A· · Correct.

24    Q· · You would get a ten minute break for days when you worked at least three

25   and a half hours, correct?

26
    A· · Correct.
27

28

41

(Perez Dep. at 24:12-23, ECF No. 102-1 at 17.)  Defendants proffer such testimony prompted two Rule 11 warnings from the Court, on the grounds that the operative Complaint contained allegations that were flatly refuted by the named Plaintiff.[14]

The Court finds it more appropriate to focus on the currently named Plaintiff and proposed class representative Vega.  As to her, Defendants first argue she has likewise testified that she regularly took meal and rest breaks in accordance with Defendants' policies.  Plaintiff replies that Defendants' arguments are misleading as the cited testimony only asks Plaintiff about what Defendants' meal and rest break policies were, not whether she in fact took breaks in accordance with those policies.  The first portion of the highlighted testimony is as follows:

> Q You received the company's meal and rest period policies when you were hired; correct?
>
> A Yes . . .
>
> . . . Q And [the] meal period policy that you received when you were hired gave you a 30-minute meal period to be taken before the end of your fifth hour of work; correct?
>
> A Yes.
>
> Q And the policy provided that you were not to perform any work during your 30-minute meal period; correct?
>
> A Yes.
>
> Q And the policy provided that you would get a second meal period if you worked more than 10 hours; correct?
>
> A Yes . . .
>
> . . . Q And the policy provided that you got a 10-minute duty-free rest period for every four hours of work; correct?
>
> A Yes.

---

[14]  The Court stated in the October 31, 2019 order granting the Defendants' motion for judgment on pleadings, denying leave to file proposed FAC, and granting leave to amend generally, that: "[h]ere, the futility of substantial aspects of the PFAC compels the court to deny plaintiff leave to file the PFAC.  As documented by defendants, plaintiff has already conceded that he is barred from bringing certain claims and cannot proceed against several of the currently named defendants . . . Yet, plaintiff has nevertheless included those claims and defendants in the PFAC." (ECF No. 36 at 21:8-12.)  The Court also noted that "plaintiff should heed Rule 11 of the Federal Rules of Civil Procedure."  (ECF No. 36 at 21 n.4.)  In the July 29, 2020 order granting in part Defendants' motion to dismiss, the Court stated: "The court again cautions plaintiffs to heed Rule 11 of the Federal Rules of Civil Procedure . . . Although the court need not now reach the merits of the arguments presented by defendants in their motion to strike, the court will not turn a blind eye to claims brought baselessly if it later comes to light that such allegations were facially untenable given the evidence already available to the parties."  (ECF No. 51 at 18 n.10.)

42

(Vega Dep. at 26:18-20; 26:25-27:12; 27:17-20.)  Defendant argues Vega testified that, during more than six years of employment, she could only recall one potential meal period violation, where she was "interrupted" while already on a meal break.  While Defendants claim Plaintiff could only recall one meal period violation during her employment, the cited questions ask Plaintiff about what her timekeeping records show and whether she was prevented from taking a meal period, not regarding all meal period violations she experienced, and thus Defendant's framing is not entirely persuasive to the Court.  The relevant testimony is as follows:

> Q Ms. Vega, these records show that you regularly got a 30-minute meal period that began before the fifth hour of your work . . . Do you acknowledge that?
>
> A Yes.
>
> Q Were you ever prevented from taking a meal period for any reason other than that one instance when someone interrupted you?
>
> [objection: misstates testimony]
>
> A I don't recall.

(Vega Dep at 101:3-7.)  With respect to rest breaks, Defendants highlight Vega testified that no one ever told her rest breaks should not be taken:

> Q Did anyone at Tenaya ever tell you that you can't take your rest breaks?
>
> A No.

(Vega Dep. at 76:21-23.)  Defendants highlight Vega recalls that she took two or three rest breaks per day, during an eight hour shift, in order to smoke cigarettes, and suggest Vega could not deny that each break was 15-20 minutes in duration.  Plaintiff replies that Defendants mischaracterize her testimony by equating her cigarette breaks with rest breaks and making argumentative assumptions regarding the length of those breaks.  Defendants cite the following testimony:

> Q Ms. Vega, isn't it true that you were a smoker while you were working at Tenaya?
>
> A I did smoke, and I still do . . .
>
> . . . Q And how many times a day did you go down to smoke a cigarette in the employee outside area?

1                  A Two or three times . . .

2                  . . . Q So you had to go down to the ground floor and outside of the
                  – of the hotel in order to have a cigarette; correct?

3

                 A Yes. That's where I smoked . . .

4

                 . . . Q Ms. Vega, if witnesses have said that you were seen smoking

5                  cigarettes down in the outside employee smoking area and being
                 away from your workstation for 15 or 20 minutes at a time for your

6                  smoke breaks, would they be lying?

7                  A I don't know. I don't know if they're lying or not because I didn't
                 keep track of the time.

8

9 (Vega Dep. at 70:15-17; 70:24-71:1; 71:6-9; 73:11-18.)  The Court notes that prior to the question

10 of whether a witness would be lying, Vega testified that she was not sure how long it would take

11 to take a cigarette break:

12                  Q. So how much time did it take you to get from your work area out
                 to the employee smoking area, smoke your cigarette, and get back

13                  to the work

14                  Q. So you're saying it was five minutes total that you would be
                 gone for your smoke break?

15

                 A. It could be.

16

                 Q. Did you ever time it?

17

                 A. No.

18

                 Q. So how do you know it was five minutes and not 10?

19

20                  A. Well, you're asking me for the time more or less.  And I'm not
                 sure; I'm not sure how long it would take.

21 (Vega Dep. at 72:23-73.)

22       While the Defendants' framing is somewhat incomplete, the Court finds the testimony

23 from Vega provides *some additional* weight toward denying class certification, and specifically

24 finding Plaintiff Vega's claims are not typical of the class.

25         vi.      Other Declarants' Testimony Re Meal And Rest Breaks

26       Review of Plaintiff's declaration and other proffered declarants provides additional weight

27 toward denying class certification, and finding individualized issues predominate, in support of

28 the Court's findings above.  Plaintiff's compendium of evidence (ECF No. 82-1) includes 16

putative class member declarations, however, as noted above, four of those declarations (Sandra Diaz, Alfredo Marquez, Reina Oviedo, and Kalli Southwood) were stricken.[15]   Therefore, Plaintiff's motion is supported by 12 putative class member declarations.  (See ECF No. 82-1 at 2 (listing 16 declarations, with 4 stricken).)

        1)    Vega

Defendants argue Vega stated in her declaration that "she falsified" her time records, by representing in time clock attestations that she took meal or rest periods when she actually did not take them.  (Opp'n 14.)  Specifically, Vega declares that "[s]o, when I clock out for the day, I always answer yes or signed to having received a meal period and rest periods, even when I did not receive them."  (Vega Decl. ¶ 7, ECF No. 82-4.)[16]  In relation to this aspect of the declaration, Defendants highlight in her deposition, Vega testified that Defendants' policies required her to punch out at the beginning and end of her meal periods and she was "always honest" when she recorded her meal periods:

> Q And you were always honest when you input your time into the timekeeping system regarding the time that you began and ended your meal periods?
>
> A Yes.

(Vega Dep. at 28:16-19.)  Defendants thus argue that based on this testimony, some of Vega's time records were true and some of her time records were false; but given the time records themselves all indicate that they are true, individualized inquiries would be necessary to find out whether Vega – and other employees in the proposed class – actually took meal or rest periods. (Opp'n 14.)  Plaintiff replies that Defendants mischaracterize her statements in her declaration

---

[15]  As Defendants note, Plaintiff's motion also cites to a declaration, of a "Larry Weise," but such declaration does not appear to have been filed with the Court.

[16]  In full context, this paragraph reads: "I clocked out for my meal period and returned to work without taking my actual meal period or only taking a part of my meal period approximately one to two times per month because I was assigned too many rooms to clean for that shift and the supervisors did not relieve me for my meal period.  At the end of my shifts, I was required to answer whether I received my meal period and rest breaks in order to clock out for the day.  When I answered no or did not want to sign that I got my breaks, my supervisors disciplined me about not taking my break, but the reason I did not receive my breaks is because my supervisors assigned me too many rooms to clean in an eight-hour shift and had told me not to work overtime.  So, when I clock out for the day, I always answer yes or signed to having received a meal period and rest periods, even when I did not receive them."  (Vega Decl. ¶ 7.)

and deposition testimony, which are on different topics, to baselessly accuse Plaintiff of not being honest. Plaintiff contends that her statement that she answered yes on the attestation at the end of the day even when she did not receive her breaks is entirely consistent with her testimony that she was honest about the time she input into the timekeeping system regarding when she began and ended her meal breaks, and nothing about Plaintiff's testimony creates individual issues regarding Defendants' meal break policies and practices.

The Court does not find the intricacies or extrapolations the Court could or could not make from the deposition testimony on this precise point determinative or *necessarily* creates individual issues, but individual issues do predominate for the reasons and authority discussed herein. Overall however, the Court does find that at least the conflicting testimony does lend to finding Plaintiff herself has individualized issues, particularly the fact she took some form of cigarette rest break 2 to 3 times per work period, and although she is unsure of the time period, it appears reasonable to presume based on the testimony that it took at least 10 minutes to reach the smoking area, smoke, and return to a work station. This impacts typicality as well.

Defendants argue that other declarants disavowed their own declarations as to their meal and rest period experiences. Plaintiff replies that Defendants likewise misrepresent the testimony of some of the declarants to claim that they are not accurate, though they are generally consistent with their declarations. Plaintiff notes that only one declarant, Miguel Arias, testified to widespread inaccuracies in his declaration, and he testified that he reviewed his entire declaration before signing it and had changes, but failed to communicate any changes he wanted to make before signing his declaration. Otherwise, Plaintiff argues the declarations submitted in support of the motion for class certification are generally consistent with the putative class members' deposition testimony and should not be disregarded. The Court turns to consider such evidence.

2)     Arias

Plaintiff's declarant, Miguel Arias, stated in his declaration that: "supervisors frequently failed to permit us to take meal periods when we were busy." (Arias Decl. ¶ 6.) At deposition, Arias testified that the statements in his declaration about not receiving meal and rest breaks were false:

1

2

3

     Q . . . [L]et's start with the first sentence [in your declaration]. It says, "The supervisors frequently failed to permit us to take meal periods when we were busy." There was never a time that you were denied a meal period for any reason at Tenaya, correct?

4

     A Correct.

5

     Q So that sentence is false, right?

6

     A Correct. False.

(Dep. Miguel Arias ("Arias Dep.") at 53:19-54:2, ECF No. 102-1 at 36.)  Arias testified that he

7

was always provided meal periods, contrary to what is stated in his declaration:

8

9

     Q And you always got a meal period of at least 30 minutes for every shift that you worked at Tenaya, correct?

10

     A Correct.

11

12

(Arias Dep. at 31:20-23.)  Arias testified that his supervisors sent him to take meal breaks, rather

than preventing him from taking meal breaks:

13

14

15

     Q But the supervisor always sent you off for your meal break every single shift that you worked for Tenaya and you got a full 30 minutes before the end of the fifth hour of work, correct?

     A Correct.

16

(Arias Dep. at 50:24-51:3.)

17

18

19

20

     Arias also stated in his declaration: "I was often called back to work by my supervisors before the end of my full 30-minute meal period."  (Arias Decl. ¶ 7.)  But Arias directly disavowed this statement and testified at his deposition that he was "never" called back before the end of a 30-minute meal break:

21

22

     Q It says you were often called back to work before the end of your full 30-minute meal period. So that's not correct, is it?

23

     A Correct.

24

     Q So its inaccurate, correct?

25

     A Correct.

26

27

28

     Q So if you were never required to return back to work before the end of your 30-minute meal period, why did you sign this stating that you were required to return to work before you finished your 30-minute meal periods?

A I just – I guess I didn't read through it thoroughly.

(Arias Dep. at 58:20-59:8.)  With respect to rest periods, Arias admitted that his testimony about supervisors failing to permit breaks was false:

> Q Paragraph 8 [of your declaration] says that supervisors had to tell you when to take rest breaks. That is inaccurate, correct?
>
> A. Correct.
>
> Q And the next sentence says, "We were not permitted to decide for ourselves when or whether to take rest breaks." That is inaccurate, correct?
>
> A Correct . . .
>
> . . . Q The next paragraph, paragraph 9, states: "The supervisors frequently failed to permit us to take rest breaks when we were busy." That's not true, is it?
>
> A That's true.
>
> Q This is inaccurate, correct?
>
> A Correct.

(Arias Dep. at 59:10-60:5.)  Arias also admitted that his declaration was inaccurate in stating that he was denied rest periods five days per week:

> Q But this says that they wouldn't give you a rest break five days per week, a first rest break. So that's not true is it?
>
> A Correct.
>
> Q So this is inaccurate, also, right?
>
> A Right.

(Arias Dep. at 61:17-22, ECF No. 102-1 at 48.)  Arias testified that most of his declaration was false, because he didn't read it carefully:

> Q So, Mr. Arias, most of what you signed under penalty of perjury is false in this declaration. Is that because you just didn't read it carefully before you signed it?
>
> A I think so, yes.

(Arias Dep. at 61:23-62:3.)  Arias admitted that he trusted the lawyers who filed the case to prepare an accurate declaration, which is why he did not bother to review his sworn testimony

1   carefully before signing it:

2   > Q So you just trusted the attorney to accurately reflect what you had told her on the phone, and that's why you didn't read through this carefully; is that right?

3

4   > A Correct.

5   > Q But now that you've had a chance to really review this declaration, you acknowledge that most of this is false statements, correct?

6

7   > A Correct.

8   (Arias Dep. at 62:12-20.)

9   Clearly the Court must find the concessions of inaccuracies by Arias requires the Court

10  not to consider the declaration as supporting certification despite being cited in support as noted

11  above.  Further, the Court finds the tenor of the deposition testimony as completely contrary to

12  the declaration testimony, provides general weight behind Defendants' position concerning

13  Plaintiff's declarations overall, and support finding individualized issues predominate.

14  > 3)    Hoppenrath

15  Plaintiff's declarant, Ryan Hoppenrath, stated in his declaration: "I was not allowed to

16  take my meal period until after I had already worked for five hours approximately two to three

17  times per week because there was too much work and not enough people working."  (Hoppenrath

18  Decl. ¶ 7, ECF No. 82-9.)  However, Hoppenrath testified at deposition that he was, in fact,

19  taking breaks within a five-hour period and his declaration may have been a

20  "miscommunication":

21  > Q Sir, in your sworn statement that you signed in connection with this case you stated that you were not allowed to take your meal period until after you had already worked for five hours approximately two to three times per week.  Now that you've seen your time records, do you still believe that's an accurate statement?

22

23

24  > A Okay. At the time of me making those statements it's been a couple of years since I worked there. I – I do believe now that I was taking my breaks within a five-hour period. I believe that may have been a miscommunication or – yeah.

25

26

27  (Dep. Ryan Hoppenrath ("Hoppenrath Dep.") at 79:4-20, ECF No. 102-1 at 52.)  Defendants

28  proffer that Hoppenrath's deposition testimony revealed that his prior declaration testimony is at

1   odds with what he recorded on his own time records:

2
    > Q And based on the time records that you reviewed today, you can
    > see that you did regularly get your meal periods of at least 30
3   > minutes before the end of the fifth hour of work, correct?

4
    > A Based off the – what I seen today, correct.

5   (Hoppenrath Dep. at 85:7-16.)   Plaintiff replies that Defendants asked Ryan Hoppenrath to

6   assume that the document purportedly containing his timekeeping records was accurate, though

7   he had never seen that document before, and testify based on that unauthenticated document

8   instead of his own recollection, and Hoppenrath made clear, his recollection was consistent with

9   his declaration.   The Court does acknowledge Hoppenrath's testimony was in part only a

10  concession in part based on those written time records being the best indicator of when he got

11  meal periods, however, the Court finds the testimony where Hoppenrath states the declaration's

12  statements were a miscommunication, indicates that Hoppenrath did disagree with the previous

13  declaration that he was not allowed to take the meal period after five hours two to three times a

14  week.  Plaintiff highlights the following testimony of Hoppenrath in reply:

15
    > Q  And so even on those records alone, there were, in fact, times
    > where you were not provided a meal break before the fifth hour of
16  > work; isn't that correct?

17  > A  Correct.

18
    > Q  And based on your recollection, there were other times where
    > you were not able to take your meal period before your fifth hour of
19  > work because of understaffing or too many guests needing
    > assistance at the same time; is that correct?
20

21  > A  Correct.

22  > Q  And so looking at paragraph 7, isn't it, in fact, correct based on
    > your memory of your time working at Tenaya that you were not
23  > able to take your meal period before the fifth hour of work two to
    > three times per week for those reasons of understaffing or having
24  > too many guests to assist?

25  > A Yeah. Correct. There were a handful of times.

26  (Hoppenrath Dep. at 100:13-101:6, ECF No. 108-2 at 4-5.)  However, even taking this section as

27  reinforcing some of paragraph 7, the Court finds it significant that Hoppenrath only concedes

28  there were a handful of times, which would not seem to equate with an occurrence that happened

2 to 3 times a week.  The Court finds this does reduce the evidentiary value of Hoppenrath's declaration as Defendants have shown certain weaknesses.

       4)      Rascon

      Alexandria Rascon testified in her declaration: "I was not allowed to take my meal period until after I had already worked for five hours approximately five times per week because we were short-staffed or too busy."  (Rascon Decl. ¶ 6.)  Defendants proffer Rascon admitted that "on average" she regularly took 30-minute meal periods before the end of her fifth hour of work:

> Q So have you regularly received meal periods of 30 minutes or longer before the end of your fifth hour of work at Tenaya?
>
> [objection: vague and ambiguous, overbroad]
>
> A On average, I would say yes.

(Dep. Alexandria Rascon ("Rascon Dep.") at 44:14-19, ECF No. 102-1 at 61.)  While stating only on average and not always or regularly, the Court finds it in conflict given the significantly large number of days per week, five times, declared.

      In her declaration, Rascon also stated: "On days when I worked over 10 hours, I was not permitted to take a second meal period approximately five times.  I worked over 10 hours in a shift approximately seven times."  (Rascon Decl. ¶ 7.)  Defendants argue Rascon's deposition testimony is in direct contradiction to these statements as well as she stated she could not recall if there was ever a day when she was denied a second meal period:

> Q Do you recall any instance when you were not permitted to take a second meal period after working over ten hours?
>
> A I can't recall, no.

(Rascon Dep. at 77:20-23.)   The Court finds this testimony has some limited relevance in contradicting the declaration.

      Rascon also stated in her declaration that "our supervisors often failed to provide us with a first 10-minute rest break approximately ten times per month.  When I worked a shift lasting longer than six hours, approximately ten times per month, I was not provided with a second 10-minute rest break."  (Rascon Decl. ¶ 11.)  Defendants highlight Rascon testified that she did, in

1   fact, take her ten-minute rest breaks twice per day, during an eight-hour shift, "on average":

2          Q Ms. Rascon, you testified earlier today that you were able to take
           rest breaks when you want and that you regularly get your ten-
3          minute rest breaks twice a day. Do you remember that testimony?

4          A I did say on average, yes.

5   (Rascon Dep. at 116:9-14.)

6          Plaintiff responds that Defendants misrepresent Rascon's testimony regarding how

7   frequently she received meal and rest breaks by including incomplete quotations from her

8   deposition transcript, as she went on to testify she was receiving meal and rest breaks far less than

9   average at the beginning of her employment, but was generally receiving her meal breaks in her

10  most recent position, stating "No.  Rest and meal breaks were far less than average when I

11  worked at the general store, the gift shop."  (Rascon Dep. 45:5-7.)  Rascon testified it depended

12  on the time of year, and predominantly during winter that she would not receive regular meal

13  periods, because of being too busy or being understaffed.  (Rascon Dep. 45:17-46:5, ECF No.

14  108-4 at 4-5.)

15         Even taking Plaintiff's clarification regarding the different time periods and positions

16  having different experiences, the Court finds this would likely in any event lend to finding

17  individualized issues predominate, as even with this one individual, it depended on the time of

18  year and the particular position in relation thereto that she was currently in.

19         5)      Murray

20         Ryan Murray, stated in his declaration that "supervisors frequently failed to permit us to

21  take meal periods when we were understaffed" and "the supervisors also did not permit us to take

22  meal periods when we were busy during our seasonal events."  (Murray Decl. ¶ 6.)  Defendants

23  highlight that at deposition, Murray stated he "regularly" took compliant meal periods:

24         Q You regularly did take a meal period of at least 30 minutes for
           every five hours of work; correct?
25
           A Yeah.
26

27  (Dep. Ryan Murray ("Murray Dep.") at 14:13-16, ECF No. 102-1 at 72.)  With respect to rest

28  periods, Murray stated in his declaration that "[o]n occasions when I was able to take a rest break,

52

I was often ordered back to work by my supervisors before the end of my full 10-minute rest break because my supervisor needed something corrected with the event setup or needed an extra hand to help with the event." (Murray Decl. ¶ 10.) Defendants highlight at deposition, Murray testified that he "regularly" took "an uninterrupted ten-minute rest period," per Defendants' policies:

> Q And per the policy, employees were to get an uninterrupted ten-minute rest period for every four hours of work or major fraction of four hours. You also regularly took those rest periods; correct?
>
> A Yes.

(Murray Dep. at 14:17-22.)

Plaintiff replies that Murray's declaration statement that his supervisors failed to permit him to take meal periods when they were understaffed or busy during seasonal events is consistent with his testimony that he regularly took 30-minute meal periods, as his testimony that he was often called back to work during rest breaks to assist with event setup is also consistent with his testimony that he regularly took rest breaks, which did not address interruptions of breaks. The Court finds some merit to Plaintiff's response to Defendants' framing, however, the concessions of regularly taking such breaks in the face of the declaration statement that he was frequently not allowed to, does reduce the weight of the declaration, or at least reinforces the Court's findings of individualized issues predominating.

6)      Ruiz

Plaintiff's declarant, Stephanie Ruiz, stated in her declaration that she "was not allowed to take [her] meal period until after [she] had already worked for five hours approximately 3 times per month." (Decl. Stephanie Ruiz ("Ruiz Decl.") ¶ 5, ECF No. 84.) Defendants highlight that at her deposition, Ruiz admitted that she was "always" able to take an uninterrupted 30-minute meal period before her fifth hour of work:

> Q. And you remember before how you testified that you always were able to take your 30-minute -- your 30-minute uninterrupted meal period before your fifth hour of work; correct?
>
> A. Yes.

(Dep. Stephanie Ruiz ("Ruiz Dep.") at 51:18-22, ECF No. 102-1 at 79.) Plaintiff replies that

Defendants misrepresent Ruiz's testimony from earlier in the deposition to her, which stated that she regularly received her 30-minute uninterrupted meal periods, not that she always received them before her fifth hour of work.  The Court notes the earlier testimony was:

> You were regularly able to take your 30-minute meal period; isn't that right?
>
> A. Yeah, the 30-minute one.

(Ruiz Dep. at 20:14-16.)  The earlier testimony also reflects:

> You testified earlier that you were able to regularly take your 30-minute uninterrupted meal period; correct?
>
> A. The 30-minute one.
>
> Q. Okay. And that was throughout your employment at Tenaya; correct?
>
> A. Yes.

(Ruiz Dep. at 25:10-17.)

Plaintiff correctly points out the use of "regular" in previous testimony, and the attorney's use of "always" in the later question, however, Ruiz's response to that question nonetheless does reduce the weight, or shows individualized issues predominate, rather than supporting a uniform policy.

7)    Tainter

Plaintiff's declarant, Joshua Tainter, stated in his declaration that "our supervisors failed to provide us with a first 10-minute rest break approximately five to six times per month.  When I worked a shift lasting longer than six hours, approximately eight to ten times per month, I was not provided with a second 10-minute rest break because we were so understaffed."  (Tainter Decl. ¶ 11.)  Defendants highlight that Tainter's deposition testimony was different – he admitted that he regularly took rest periods for every four hours of work or major fraction thereof:

> Q And according to this policy, you were to get an uninterrupted ten-minute rest break for every four hours of work or major fraction thereof. You regularly took those rest periods; correct?
>
> [objection]
>
> A Correct.

1   (Dep. Joshua Tainter ("Tainter Dep.") at 14:19-23; 25, ECF No. 102-1 at 87.)  Plaintiff replies

2   that Tainter's testimony that he regularly took rest breaks is also consistent with his declaration

3   statement that supervisors failed to provide him with rest breaks multiple times per month.  The

4   Court finds the arguments regarding this particular deposition do not sway the analysis in a

5   meaningful regard.

6           vii.    Defendants' Declarations

7           In addition to arguing the twelve declarations of Plaintiff's are largely contradicted by

8   their own deposition testimony, Defendants have submitted 36 additional declarations which they

9   argue show employees took meal and rest periods in compliance with Defendants' policies and

10  the Wage Order throughout the class period.  Defendants submit that by themselves, the 36

11  declarations submitted by Defendants destroy the common evidence needed for class

12  certification.  Plaintiff replies that the Court should disregard the thirty-six declarations of

13  Defendants' because they were submitted by individuals that were employed at the time the

14  declarations were executed.  See Avilez v. Pinkerton Gov't Servs., 286 F.R.D. 450, 458–59 (C.D.

15  Cal. 2012), vacated and remanded sub nom. Avilez v. Pinkerton Gov't Servs., Inc., 596 F. App'x

16  579 (9th Cir. 2015); Barriga v. 99 Cents Only Stores LLC, 51 Cal. App. 5th 299, 327, 265 Cal.

17  Rptr. 3d 1, 22 (2020).

18          While Plaintiffs do not make a formal request to strike the declarations, Plaintiff asks the

19  Court to "disregard" the 36 declarations, simply because they come from current employees.

20  (Mot. 10.)  Disregarding rather than considering and determining the appropriate weight to be

21  given the various declarations, is essentially requesting the Court to strike the declarations from

22  consideration at this stage.  Such disregarding or striking would be a severe remedy, and one the

23  Court employed in this case already via an informal discovery conference, order, and stipulation

24  of the parties.  Specifically, four individuals that submitted declarations for Plaintiff failed to

25  appear for depositions noticed by Defendants multiple times, and essentially ceased responding to

26  inquiries from Plaintiff's counsel.  That is a circumstance where striking the declaration is

27  appropriate.  Plaintiff has made no such showing that all declarations should be disregarded from

28  consideration, and as this Court has previously found, and as discussed below, "[c]ontrary to

1     Plaintiffs' contention that [Avilez] supports the argument that the evidence should be excluded . .

2     . to the extent that such testimony is relevant here it is for the trier of fact to determine the weight

3     to assign to the evidence."   Medlock v. Taco Bell Corp., No. 1:07-CV-01314-SAB, 2016 WL

4     430438, at *12 (E.D. Cal. Feb. 4, 2016) (adjudicating motion *in limine*).

5        Turning to the cases cited by Plaintiff, the Court recognizes that it "must be cognizant of

6     the danger of coercion and exercise a healthy skepticism when assessing the evidentiary weight to

7     be given to employee statements."   Barriga, 51 Cal. App. 5th at 327 (" 'Common sense and

8     prudence' instruct that affidavits from a defendant's current employees do little to rebut evidence

9     in support of a plaintiff's claims 'insofar as they were given under potentially coercive

10    circumstances.' " (quoting Brown v. Nucor Corp., 785 F.3d 895, 913 (4th Cir. 2015))).   However,

11    as noted in Barriga, "the mere existence of a potentially or inherently coercive relationship is

12    insufficient to support an order entirely striking employee declarations submitted in opposition to

13    a class certification motion, or to [even] support a finding severely discounting the weight to be

14    given those declarations," and rather "a compelling showing that the employees were misled or

15    that the declarations were not freely and voluntarily given will suffice."   Id. (citations omitted).

16       In Sims, the court overruled the plaintiff's objection to defendants' class member

17    declarations, noting the three cases relied on by plaintiff were inapplicable.   Sims v. QG Printing

18    II, LLC, No. EDCV201632DMGKKX, 2022 WL 1592599, at *2 (C.D. Cal. Mar. 4, 2022).   The

19    first involved defense counsel improperly representing the declarants at their depositions after the

20    declarants provided the declarations, and the court found a conflict of interest was created that

21    precluded the defense from using anything in the declarations.   Id. (citing Richardson v. Interstate

22    Hotels & Resorts, Inc., No. C 16-06772 WHA, 2018 WL 1258192, at *7 (N.D. Cal. Mar. 12,

23    2018)).

24       The second case the Sims court found inapplicable was Avilez, noting there the district

25    court had stricken the employee declarations as a discovery sanction pursuant to Rule 37(c)(1).

26    2022 WL 1592599, at *2 (citing Avilez, 286 F.R.D. at 458)).   In Avilez, cited by Plaintiff here,

27    the plaintiff objected to the "survey and the 30 employees' declarations because neither the expert

28    nor the employee declarants' names or contact information were produced in Defendant's Initial

or Supplemental Disclosures," and the court granted the request to strike the survey and declarations because the failure to disclose its expert and employee declarants violated Federal Rule of Civil Procedure 26(a)(1)(A). Avilez, 286 F.R.D. at 458. The Court notes that the Avilez court nonetheless stated that even if it did not strike, it would alternatively give little weight to the responses, given the considerations applicable to weighing statements of current employees provided by an employer. Id. at 458-59 ("An employee has every incentive to answer 'yes' when her employer's attorney asks if she likes her employer's current practice, as an affirmative answer may endear her to current management and a negative answer may endanger her job . . . incentives to answer untruthfully are even more skewed where, as here, the employer's question concerns a practice *currently being litigated in a putative class action as an illegal practice* . . . even if this Court had not struck Defendant's survey as a discovery sanction, this Court would give little weight to survey responses that "may have indicated overall satisfaction with the" defendant, "but that may reveal more about [the respondent's] loyalty than whether or not they had an ... experience that would render them class members.' "). While remanded, the Ninth Circuit found the "district court did not abuse its discretion by striking Pinkerton's expert survey and supporting declarations [as] Pinkerton failed to timely identify its expert, the survey instrument, and the identities and contact information for its employee declarants," in violation of Federal Rule of Civil Procedure 26. Avilez, 596 F. App'x 579.

The third case cited in Sims, was Barriga, and the Sims court noted Barriga warns to scrutinize such declarations for coercion or abuse, and concluded that "Sims has not shown any evidence of coercion or abuse . . . no evidence that any of the putative class members who submitted declarations believed the attorneys with whom they met in QG's offices represented anyone other than QG [and] [a]lthough Sims points to evidence of minor errors in the class members' declarations, these errors do not warrant striking the declarations." Sims, 2022 WL 1592599, at *2. Here, while the Court remains cognizant of the dangers of relying on declarations from current employees, Avilez, 286 F.R.D. at 458–59, the Court does not find the circumstances here rise to any level where the Court should disregard the declarations as Plaintiff suggests, but rather the Court has considered the dangers of coercion or abuse, and has reviewed

1    the entirety of the collection of 36 declarations cognizant of such danger.  Sims, 2022 WL

2    1592599, at *2.  This is consistent with this Court's previous review and application of Avilez

3    when adjudicating a motion *in limine* relating to a class action trial.  See Medlock, 2016 WL

4    430438, at *12 ("[T]he [Avilez] court indicated that it would have given little weight to the

5    survey due to the possibility that the responses went more to the loyalty of the respondents [and]

6    [s]imilarly here, all such testimony should not be excluded, but to the extent that such testimony

7    is relevant here it is for the trier of fact to determine the weight to assign to the evidence.").

8         Plaintiff additionally argues that "where there is sufficient evidence of common issues,

9    'dueling declarations do not preclude a finding that common issues predominate.' "  Espinosa v.

10   Genesis Healthcare, Inc., No. CV 20-688-DMG (JCX), 2021 WL 2497938, at *13 (C.D. Cal.

11   Mar. 31, 2021) (quoting Hoffman v. Blattner Energy, Inc., 315 F.R.D. 324, 343 (C.D. Cal.

12   2016)); Negrete v. ConAgra Foods, Inc., No. CV160631FMOAJWX, 2019 WL 1960276, at *11

13   (C.D. Cal. Mar. 29, 2019) ("[A]t the class certification stage, 'the Court must only determine

14   whether the plaintiffs have proffered enough evidence to meet the requirements of Rule 23; the

15   Court need not weigh the persuasiveness of conflicting or competing evidence.' " (quoting Kamar

16   v. Radio Shack Corp., 254 F.R.D. 387, 395 (C.D. Cal. 2008))).  Plaintiff thus argues that

17   Defendants' arguments based on conflicting testimony are "better-suited for trial, as they go to

18   the merits of [Plaintiff's] claims, not whether common questions predominate."  Espinosa, No.

19   CV 20-688-DMG (JCX), 2021 WL 2497938, at *13 (C.D. Cal. Mar. 31, 2021) (quoting Hoffman,

20   315 F.R.D. at 343).

21        While the Court agrees with Plaintiff that dueling declarations do not *preclude*

22   certification where there is sufficient evidence of common issues predominating, and the Court

23   should not weigh the merits but rather determine predomination for purposes of certification, the

24   Court can appropriately consider the context of the declarations individually and overall as a

25   whole as to determine whether they support Plaintiff's theory of commonality and other relevant

26   factors under Rule 23.  See Mora v. Big Lots Stores, Inc., 194 Cal. App. 4th 496, 510 (2011)

27   ("[T]he trial court largely discounted that evidence, commenting on the lack of detail in the

28   putative class members' declarations and the similarity in the wording of many declarations, as

well as the discrepancies between the former managers' deposition testimony and their declarations . . . [while] class representatives contend the court's rejection of their evidence constituted, in effect, an impermissible trial on the merits[,] [d]eciding whether common questions predominate in a retail store manager misclassification case, however, necessarily requires the court to evaluate the nature of the evidence presented purporting to show the defendant company operates its stores or supervises its managers in a uniform and standardized manner."); Keller v. Tuesday Morning, Inc., 179 Cal. App. 4th 1389, 1399 (2009) (trial court's statement that managers "who filed declarations for the class, were impeached by their deposition testimony [] was a comment on the nature of the evidence, and did not constitute a consideration of the case on the merits, or a determination of witness credibility [and] [s]ubstantial evidence supports the trial court's conclusion that individualized issues of liability and damages will predominate over issues common to the class if the overtime claims are tried as a class action.")[17]

Thus, the Court is essentially weighing the totality of the nature of the evidence, not conducting a mini-trial on the credibility or precise contours of the particular witness testimony, but rather considering the impact on the determination of commonality, typicality, and whether individualized issues predominate.  See Juarez v. Jani-King of California, Inc., 273 F.R.D. 571, 577–78 (N.D. Cal. 2011) ("[T]he Court accepts these declarations for what they are—the statements of twelve franchisees within a putative class of nearly two thousand—rather than a reliable representation of the class as a whole . . . [a]side from citing to handpicked declarations— some of which are contradicted by the franchisees' deposition testimony—there is no evidence, let alone common evidence, of such an injury.").  Having already considered the above testimony, the Court turns to also weigh the various content of the declarations from Defendants, and determine whether they support or weigh against class certification.

Defendants highlight that with regard to meal periods, Heather Buvalla, an employee who worked in the Administration Department, states in her declaration that: "Every time that I have

---

[17]  The Court notes Keller uses language lumping issues of liability and damages as both potentially individualized, while the Court recognizes discussion in other cases cited herein focus on whether liability, or damages, as distinct issues remain to be determined.

worked a shift of at least five hours, I have been provided with an uninterrupted, duty-free meal period of at least 30 minutes." (Decl. Heather Buvalla ("Buvalla Decl.") ¶ 12, COE Ex. N, ECF No. 102-2 at 130.) Defendants submit that the declarations of 23 other witnesses state similar facts as to meal periods.[18]

Defendants highlight employees also testified that their meal periods are often or always more than 30 minutes. For example, Cynthia Lopez, an employee who worked in the Housekeeping Department, states in her declaration: "My meal periods have always lasted at least 35 minutes, but are often longer, as my supervisors do not mind if we take additional time for meal periods." (Decl. Cynthia Lopez ("Lopez Decl.") ¶ 18, COE Ex. J, ECF No. 102-2 at 93.) Defendants submit that the declarations of 17 other witnesses state similar facts.[19]

Defendants contend employees also testified that during their meal periods, they engaged in purely personal pursuits and were not interrupted by supervisors or asked to perform work-related tasks. For example, Carrie Proctor, an employee who worked in the Human Resources Department, states in her declaration: "I can do whatever I want during my meal period . . . [d]uring my meal break, I tone out the world." (Decl. Carrie Proctor ("Proctor Decl.") ¶¶ 19, 35, COE Ex. F, ECF No. 102-2 at 53.) Another employee, Robert Stump, who worked in the Engineering Department, states in his declaration that "On my meal periods, I usually grab something to eat, call my wife, and hang out until it is time to clock back in." (Stump Decl. ¶ 18.)

---

[18] See, e.g., Decl. Alyssa Allison ("Allison Decl.") ¶ 13 (same), COE Ex. A, ECF No. 102-2 at 5; Decl. Angel McElroy ("McElroy Decl.") ¶ 16 (same), COE Ex. D, ECF No. 102-2 at 32; Decl. Jose Brito ("Brito Decl.") ¶ 15 (same), COE Ex. S, ECF No. 102-2 at 182; Decl. Ana Morales ("Morales Decl.") ¶ 24 (same), COE Ex. C, ECF No. 102-2 at 23; Decl. Brigida Sierra ("Sierra Decl.") ¶ 14 (same), COE Ex. E, ECF No. 102-2 at 43; Decl. Robert Stump ("Stump Decl.") ¶ 16 (same), COE Ex. EE, ECF No. 102-2 at 305; Decl. Miguel Hernandez ("Hernandez Decl") ¶ 15 (same), COE Ex. Y, ECF No. 102-2 at 245; Decl. Jersain Camacho ("Camacho Decl.") ¶ 12 (same), COE Ex. Q, ECF No. 102-2 at 162; Decl. Mayra Carrizales ("Carrizales Decl.") ¶ 13 (same), COE Ex. X, ECF No. 102-2 at 234; Decl. Marshall Spence ("Spence Decl.") ¶ 12 (same), COE Ex. W, ECF No. 102-2 at 223; Decl. Amanda Spencer ("Spencer Decl.") ¶ 12 ("During my employment with Tenaya, I have always worked an 8-hour shift and have always received a timely uninterrupted meal period of at least 30 minutes."), COE Ex. B, ECF No. 102-2 at 14); Decl. Brigida Sierra ("Sierra Decl.") ¶ 14 (same), COE Ex. E, ECF No. 102-2 at 43. Defendant's 11 other cited declarations provide similar testimony. (See Opp'n 20.)

[19] See, e.g., Allison Decl. ¶ 17 ("My lunch breaks have always lasted at least 30-minutes. I can likely take longer lunches if I wanted to, but I prefer to take 30-minute lunches."); McElroy Decl. ¶ 20 ("My meal periods have always lasted at least 30 minutes, but are sometimes 35 minutes, as my supervisors do not care if I take additional time for meal periods."); Carrizales Decl. ¶ 18 ("My meal periods have always lasted at least 30 minutes, but on the times that they lasted a few minutes over, my supervisor does not care if I take additional time for meal periods."). Defendant's 14 other cited declarations provide similar testimony. (See Opp'n 20-21.)

1   Defendants proffer that the declarations of 17 other witnesses state similar facts about engaging in

2   personal pursuits and not being interrupted during their meal breaks.[20]

3        As to rest periods, Defendants proffer that Brigida Sierra, an employee who worked in the

4   Laundry Department, states in her declaration: "I always take my rest periods.  During my

5   employment with the Company, I have never missed a rest period.  I have also never had a late

6   rest period."  (Sierra Decl. ¶ 25.)  Brigida Sierra also declares: "I have never been discouraged

7   from taking, or prevented from taking, or forced to not take my rest periods.  I have never had my

8   rest periods interrupted by work-related matters or by a manager or other employee asking me to

9   perform work or answer work-related questions."  (Sierra Decl. ¶ 26.)  Defendants proffer the

10  declarations of 29 other witnesses state similar facts.[21]

11       Finally, Defendants highlight that employees also testified that they did whatever they

12  pleased during the entire time of their rest period, without interruption.  For example, Christie

13  Hill, an employee who worked in the Food and Beverage Department, states in her declaration:

14  "During my rest breaks, I usually grab something to drink, find somewhere to sit, and then

15  browse my phone."  (Hill Decl. ¶ 52.)  Defendants proffer the declarations of 30 other witnesses

16  also state that they were not interrupted during their rest breaks.[22]

---

17  [20]  See, e.g., Decl. Christie Hill ("Hill Decl.") ¶ 30, COE Ex. H, ECF No. 102-2 at 73.) ("On my meal breaks, I

18  usually grab lunch, heat up my food, surf social media and the internet on my phone, and put my container away in
    my locker."); Spencer Decl.¶ 18 ("No one interrupts my meal periods with work-related matters or asks me to answer
    work-related questions.  I do not carry a walkie talkie so no one is able to contact me about work-related activities

19  during my meal period. There is always coverage during my meal period so there is no need to contact me during that
    time.").  Defendant's other 15 cited declarations provide similar testimony.  (See Opp'n 21.)

20

21  [21]  See, e.g., Decl. Charles Eldred ("Eldred Decl.") ¶ 25, COE Ex. G, ECF No. 102-2 at 64  ("I always take my rest
    periods. During my employment with the Company, I have never missed a rest period."); Lopez Decl. ¶ 31 ("I always

22  take my rest periods. During my employment with the Company, I have never missed a rest period. I have never been
    discouraged from taking, or prevented from taking, or forced to not take my rest periods."); Decl. Jesus Garcia
    ("Garcia Decl.") ¶ 25 ("I always take my rest periods.  During my employment with the Company, I have never

23  missed a rest period. I have also never had a late rest period.") ¶ 26 ("have never been discouraged from taking, or
    prevented from taking, or forced to not take my rest periods."); Carrizalaes Decl. ¶¶ 33 ("I always take my rest

24  periods. During my employment with the Company, I have never missed a rest period. I have never had a late
    rest period."), ¶ 34 ("I have never been discouraged from taking, or prevented from taking, or forced to not take my

25  rest periods.").  Defendant's other 25 cited declarations provide similar testimony.  (See Opp'n 22.)

26  [22]  See Spencer Decl. ¶ 26 ("No one at the Company has ever discouraged me from taking or prevented me from
    taking my rest break.  No one has interrupted my rest breaks with work-related matters or asked me to answer work-

27  related questions."); Sierra Decl. ¶ ("I have never been discouraged from taking, or prevented from taking, or forced
    to not take my rest periods. I have never had my rest periods interrupted by work related matters or by a manager or

28  other employee asking me to perform work or answer work-related questions."); Proctor Decl. ¶ 50 ("During my rest
    breaks, I will walk around the back dock or Jackson Road and stretch my legs, go to a breakroom, use my phone, or

The Court concludes that based on all of the evidence before it, "in particular, the conflicting employee declarations submitted by each party—does not establish common wage and hour practices . . . but rather [at most,] the '[in]consistent application of the wage and hour laws between and among the various" employees.  Garcia v. Sun Pac. Farming Co-op, Inc., 359 F. App'x 724, 726 (9th Cir. 2009) (plaintiffs "thus failed to demonstrate that proposed class members 'share[ ] legal issues with divergent factual predicates' or a 'common core of salient facts coupled with disparate legal remedies.' " (quoting Hanlon, 150 F.3d at 1019)); Soto v. Castlerock Farming & Transp., Inc., No. 1:09-CV-00701-AWI, 2013 WL 6844377, at *17 (E.D. Cal. Dec. 23, 2013) ("Importantly, the evidence provided by Plaintiff and Defendant regarding a 'practice' of requiring fieldworkers to perform tray washing at home without compensation is directly in conflict [and] [p]reviously, this Court noted, '[C]onflicting testimony poses a significant concern for managing [a] class action.' " (quoting Garcia v. Sun Pac. Farming Co-op., No. CVF 06-0871 LJO TAG, 2008 WL 2073979, at *11 (E.D. Cal. May 14, 2008), aff'd sub nom. 359 F. App'x 724)); see also Arredondo v. Delano Farms Co., 301 F.R.D. 493, 507–08 (E.D. Cal. 2014) (noting "[g]enerally, this kind of conflicting evidentiary support may preclude certification," and that in Garcia, the same court had denied class certification where "Plaintiffs presented 7 employee declarations in which they claimed the employment policies had been violated as to them[;] [i]n opposition to class certification, defendants presented 33 declarations of employees who testified that the employees did not work off-the-clock, were paid minimum wage, received meal and rest periods and were provided with necessary tools and equipment . . . [and] [t]his Court held that due to the conflicting anecdotal evidence disputing whether common policies existed, there was inconsistent application of the wage and hour laws among the employees.").[23]

---

call my kids.  My rest breaks are personal time, so I can do whatever I please."); Lopez Decl. ¶ 32 ("I have never had my rest periods interrupted by work-related matters or by a manager or other employee asking me to perform work or answer work-related questions."); McElroy Decl. ¶ 39 ("I have never had my rest periods interrupted by work-related matters or by a manager or other employee asking me to perform work or answer work-related questions."). Defendant's other 25 cited declarations provide similar testimony.  (See Opp'n 22.)

[23]  See also Hubbs v. Big Lots Stores, Inc., No. LACV1501601JAKASX, 2017 WL 2304754, at *9 (C.D. Cal. May 23, 2017) ("Plaintiffs have not presented sufficient evidence to show that there was a common and consistent policy among Defendants to subject all employees at all of their stores to off-the-clock bag checks . . . [and instead] only

1          viii.    The Posting of the IWC Wage Order 5-2001

2          Defendants argue that because they posted IWC Wage Order 5-2001 in the workplace

3  throughout the class period, they have established lawful meal and rest period policies that defeat

4  any class-wide liability, and this also precludes certification.   In support of this proffer,

5  Defendants state numerous employees have testified that Defendants posted California Wage

6  Order 5-2001 in the workplace throughout the class period.[24]

7          While the Court recognizes Plaintiff's emphasis that even a facially compliant written

8  policy does not preclude certification in the face of actual contravening policies and practices that

9  undermine such policy, Alberts, 241 Cal. App. 4th at 406–07, the Court finds the evidence

10  regarding the posting of the written policy at least adds additional weight in favor of Defendants

11  and in favor of the Court's total findings above that weigh against granting class certification.

12  See Perez v. Performance Food Grp., Inc., No. LACV1700357JAKSKX, 2017 WL 6940526, at

13  *7 (C.D. Cal. Dec. 15, 2017) ("Various district courts in California have held, however, that

14  employers fulfill their duty by posting the relevant IWC Wage Order at the employee's work

15  location and need not inform individual employees of their right to take second meal breaks.");

16  Cole v. CRST, Inc., 150 F. Supp. 3d 1163, 1168 (C.D. Cal. 2015) ("Defendant's only affirmative

17  presented limited evidence that supports the position that managers at certain stores may have required off-the-clock
bag checks [and] [t]his is not sufficient to warrant certification [as] [i]ndividual issues, not common ones,
18  predominate."); Braun v. Safeco Ins. Co. of Am., No. CV 13-00607 BRO PLAX, 2014 WL 9883831, at *16 (C.D.
Cal. Nov. 7, 2014) ("Because of the putative class members' varying experiences, the meal and rest break claims are
19  not readily susceptible to common proof."); Rai v. CVS Caremark Corp., No. CV 12-08717-JGB VBKX, 2013 WL
10178675, at *9 (C.D. Cal. Oct. 11, 2013) ("[T]he declarations Defendants provide reflect that it is rare for some
20  Shift Supervisors and Assistant Managers to miss their meal or rest periods at all . . . [h]owever, Plaintiffs provide
several declarations showing that some supervisors were expected to clock out during meal periods, but were
21  required to remain in the store and be available to work . . . [t]his competing testimony is insufficient for the Court to
find that CVS had a common practice or policy of denying putative class members their meal and rest periods, and
22  the Court cannot find that common issues predominate . . . [as] [i]n the absence of common evidence that putative
class members were regularly forced to work through meal and rest periods when no other manager or supervisor was
23  on duty, the Court would need to make individual inquiries as to why individual missed meal periods."); Manigo,
2017 WL 5149225, at *4 (finding plaintiffs failed to establish commonality, as in part, "[t]he untenability of
24  Plaintiffs' theory is further highlighted by the declarations TWC provides from nine putative class members who
were not the victims of any meal or rest break violations.  Rather, these class members explain that TWC established
25  procedures allowing them to take timely meal and rest breaks regardless of any understaffing or requirement to
answer all incoming calls.');

26  [24]  See, e.g., Goehring Dep. 196:23-24 ("our wage order is posted"), ECF No. 102-1 at 10; Proctor Decl. ¶ 10
("Policies and the California Wage Order are also posted around the lodge, including near my office."); Hill Decl. ¶ 8
27  ("Policies and the California Wage Order are posted on bulletin boards around the Lodge."); Stump Decl. ¶ 10
("Policies, labor laws, and the California Wage Order are posted on bulletin boards around the Lodge, including right
28  by the Human Resources office.").

1    obligation is to notify its drivers of California's rest and meal break rules . . . [and] fulfilled this

2    obligation by posting the relevant rules at its terminals.").

3         However, the Court notes that some of the cases Defendants provide as to the posting of

4    the written policy are at the summary judgment stage.  (See Opp'n 9.)[25]  For example, in Perez,

5    the court noted the plaintiff had "not submitted any evidence that Defendants 'impede[d] or

6    discourage[d]' him from taking second meal breaks."  Perez, 2017 WL 6940526, at *7 (noting

7    that while "employers cannot impede, discourage or prohibit employees from taking meal breaks,

8    they need only make them available, not ensure they are taken." (quoting Perez v. Safety-Kleen

9    Sys., Inc., 253 F.R.D. 508, 515 (N.D. Cal. 2008))).  The plaintiff there "[i]nstead . . . submitted

10   evidence to support his positions that he did not see the IWC Wage Order posted at the City of

11   Industry Distribution Center, that Defendants did not announce the start of second meal breaks

12   over the intercom system and that he worked multiple shifts of more than 12 hours during which

13   he did not take a second meal break," and the court found "[t]his evidence does not raise a triable

14   issue of fact as to whether Defendants violated California law governing second meal breaks."

15   Perez, 2017 WL 6940526, at *7.  In Cole, the court found there were "genuine issues of material

16   fact as to whether Defendant fails to provide its drivers the opportunity to take rest breaks [as]

17   Defendant has provided admissible evidence that it informs drivers of California rest and meal

18   break rules, and a number of drivers, through deposition testimony, have acknowledged that they

19   were able to and did take rest and meal breaks," and denied the plaintiff's motion for summary

20   judgment.  Cole, 150 F. Supp. 3d at 1169; see also Nguyen v. Baxter Healthcare Corp., No. 8:10-

21   CV-01436-CJC, 2011 WL 6018284, at *7 (C.D. Cal. Nov. 28, 2011) (granting defendant

22   summary judgment and noting in part "[t]here is also no evidence [the employee] was somehow

23   deterred from reading the Wage Order or subject to any duress to forego her meal breaks.").

---

24   [25]  In Kenny, which was a certification motion, the court did note in the factual summary that wage posters

25   identifying the meal and rest break periods were posted at California salons.  Kenny v. Supercuts, Inc., 252 F.R.D.
     641, 646 (N.D. Cal. 2008).  The court denied certification largely based on the fact Plaintiff's theory could not be

26   typical or common to other class members, stating "it is apparent that plaintiff has failed to identify any theory of
     liability that presents a common question [as] [s]he attests that for a few months she was the only employee for one

27   salon which made it impossible to take breaks [and] [t]hat theory-which may demonstrate a failure to provide a meal
     period-does not apply class-wide; it applies only to those employees who did not take breaks while working alone

28   [a]nd it applies to plaintiff for only a few months of the class period and there is no indication in the record that it is
     relevant to any other class members."

1

ix.    Walkie Talkies

2        Defendants argue Plaintiff's statement regarding walkie talkies is a gross

3  misrepresentation, belied by the plain language of the policy itself.   Defendants contend the

4  policy specifically provided that employees were not required to monitor or respond to

5  communication devices during breaks:

6            Employees are not expected to remain "on call" nor available to
            respond to messages, monitor radios, telephones, email or other
7            messaging devices during meal and rest periods – even those who
            are in a sensitive position like security or information technology.
8
9  (ECF No. 82-2, at p. 89.)   Defendants argue this policy cannot be "common evidence" that

10 "employees were required to carry and keep walkie-talkies" or "remain on duty" or to be "on

11 call" during breaks, given that they were not expected to be reachable on any device.   Defendants

12 emphasize that in any event, Plaintiff concedes "the policy was revised in 2017, including to state

13 that employees should no longer carry walkie-talkies and keep them on during meal and rest

14 periods" (Mot. 12), and that Plaintiff does not contend that the policy in effect as of 2017 is

15 unlawful.  (Opp'n 10.)

16        Defendants provide declarations in this regard as well, and proffer several employees

17 testified that they were not required to carry and monitor communication devices during breaks.

18 For example, Miguel Hernandez, an employee who worked in the Housekeeping Department,

19 states in his declaration: "employees in the Housekeeping Department will notify me when they

20 go on a meal or rest period, so that I do not accidentally radio call them while they are on a meal

21 or rest period, even though they are not supposed to carry the radios during their breaks."

22 (Hernandez Decl. ¶ 30.)   Jersain Camacho, an employee who worked in the Food and Beverage

23 Department, states in his declaration: "As part of my job duties, I carry a walkie-talkie.   During

24 my meal and rest periods, I leave the walkie-talkie in my truck, which I park at the loading dock.

25 Therefore, I do not have the walkie-talkie on me during my meal and rest breaks."   (Camacho

26 Decl. ¶ 20.)  Defendants proffer that the declarations of 29 other employees state similar facts.[26]

27 [26] Lopez Decl. ¶ 26 ("I carry a radio during my working hours. I turn it off when I am on a lunch or rest break, so
that my breaks are not interrupted."); Garcia Decl. ¶¶ 20 ("I turn off my walkie talkie radio provided by the Company
28 so I am not reachable during my meal period.  I know I am not expected to be reachable to do my work when I am on
meal periods.") 34 ("I shut off my radio walkie talkie during my rest break so I am unreachable by my Department.  I

1    The Court finds the conflicting testimony provides additional weight favoring denial of

2    class certification, and specifically as to any claims relating to walkie talkies.

3         x.   Understaffing Theory

4    Plaintiff contends that employees were often "too busy" to take breaks, because

5    Defendants "maintained a practice of understaffing throughout its departments that deprived non-

6    exempt employees of coverage necessary to take full, timely, duty-free, and uninterrupted meal

7    periods." (Mot. 18.)

8    Defendants respond that Plaintiff points to no written or oral policy regarding staffing or

9    breaks in the context of what is considered "too busy," and present a number of questions to

10   demonstrate the lack of common evidence: (1) "Are breaks denied if the hotel is at 50% capacity,

11   or 60%, or 90%?"; (2) "Are breaks denied if a banquet server is covering two tables, four tables,

12   or six tables?"; and (3) "Are breaks denied if there are two guests waiting for service at the Front

13   Desk, or three guests, or six guests?"   (Opp'n 23.)   In this regard, Defendants argue the

14   "insurmountable problem" with Plaintiff's theory is there is no way to measure when such a

15   policy would have any impact on breaks, even if such a policy ever existed, and is further

16   compounded by the fact that different supervisors may have interpreted such a policy based on

17   different supervisory preferences, during different seasons, at different times, for different

18   departments, based on different staffing ratios and absenteeism, and different service needs, of

19

20   know that I am not expected to be available during my rest breaks."); Spencer Decl. ¶ 18 ("No one interrupts my
     meal periods with work-related matters or asks me to answer work-related questions.  I do not carry a walkie talkie so
21   no one is able to contact me about work-related activities during my meal period.  There is always coverage during
     my meal period so there is no need to contact me during that time."); Sierra Decl. ¶ 19 ("I am not required to carry
22   any type of radio, walkie talkie, pager, or other electronic device for my work duties in the Laundry Department.
     Only supervisors are required to carry any type of radio, walkie talkie, pager, or other electronic device as part of
23   their job duties."); Allison Decl. ¶ 25 ("I am not required to carry, and I do not carry, any type of radio, walkie talkie,
     pager, or other electronic device provided by Tenaya that would allow a manager to reach me or contact me during a
24   lunch or rest break."); Morales Decl. ¶ 35 ("I am not required to carry, and I do not carry, any type of radio, walkie
     talkie, pager, or other electronic device provided by the Company that would allow a manager to reach me or contact
25   me during a lunch break."); McElroy Decl. ¶ 31 ("I am not required to carry, and I do not carry, any type of radio,
     walkie talkie, pager, or other electronic device provided by the Company that would allow a manager to reach me or
26   contact me during a meal period."); Carrizales Decl. [COE Exh. X] at ¶¶ 27 ("As part of my job duties, I have a
     Company provided electronic device for communication purposes between myself and other housekeepers or with
27   my supervisor., 43 ("As part of my job duties, the Company provides with an electronic device that I can use to
     communicate with other housekeepers and my supervisor.  I always log out of the device before my rest break so I
28   cannot receive any communications during my rest break.").  Defendant's other 21 cited declarations provide similar
     testimony.  (See Opp'n 10.)

different guests.  Based on this, Defendants submit that such an amorphous and ambiguous policy cannot support common evidence necessary for class certification.

The Court agrees with Defendants and finds such arguments provide additional weight to toward denying class certification.  "[W]hen analyzing the element of predominance for purposes of class certification 'the focus must be on the policy the plaintiffs are challenging and whether the legality of that policy can be resolved on a classwide basis.' "  ABM Indus. Overtime Cases, 19 Cal. App. 5th 277, 308 (2017) (quoting Lubin v. The Wackenhut Corp., 5 Cal. App. 5th 926, 940 (2016)).  In Morgan, the court found plaintiffs' reliance was misplaced on cases where such "plaintiffs produced substantial evidence of a companywide employment policy and the core liability issue was whether that policy was legal or not."  Morgan v. Wet Seal, Inc., 210 Cal. App. 4th 1341, 1368 (2012) (citations omitted).  Where that is the case, "declarations describing possible individual variations in the application of the policy may have been relevant to the secondary issue of damages, but that damages issue did not predominate over the common issue regarding the legality of the policy itself."  Id. (citations omitted).  The Morgan court instead noted that "by contrast, the plaintiffs produced declaration evidence in an effort to establish a classwide method of proving liability but, as the trial court found, those declarations are not substantial evidence of an articulable companywide policy which could be used to establish classwide liability."  Id. ("[The] written policies, which do not state that employees are required to purchase or wear Wet Seal merchandise, do not provide a classwide method of proving plaintiffs' dress code claim [so] plaintiffs offered other types of evidence including the declarations of putative class members, and [] argued that evidence was probative of a classwide illegal practice [and] [h]aving chosen that litigation tactic, appellants cannot now complain because the trial court considered plaintiffs' proffered evidence and found it lacking.").

As the ABM court summarized, in Morgan, "[b]ecause there were no clear companywide policies requiring employees to purchase company clothing as a condition of employment or describing what an employee was required to wear, the trial court determined there was no common method to prove the *fact of liability* on a classwide basis [and] [r]ather, individualized inquiries would need to be made regarding, among other things, what employees were told by

1   store managers about wardrobe, how employees interpreted any such discussion, and what each

2   store manager actually required employees to purchase." <u>ABM</u>, 19 Cal. App. 5th at 308 (citing

3   <u>Morgan</u>, 210 Cal. App. 4th at 1356-57).   The <u>ABM</u> court recognized that, "[i]n contrast,

4   numerous other cases have held that individualized issues regarding *proof of the amount of*

5   *damages* class members may recover does not defeat a class action so long as there are *common*

6   *questions of liability* amenable to class resolution." <u>Id.</u> (emphasis in original) (citing <u>Faulkinbury</u>,

7   216 Cal. App. 4th at 232–240; <u>Jones</u>, 221 Cal. App. 4th at 997; <u>Benton v. Telecom Network</u>

8   <u>Specialists, Inc.</u>, 220 Cal. App. 4th 701, 726 (2013) (theory that defendant violated wage and hour

9   requirements by failing to adopt meal and rest break policies is amenable to class treatment;

10  whether employee was able to take required breaks goes to damages)).

11       The Court finds additional support to find such alleged policies of understaffing, here, are

12  not amenable to class certification.   <u>Zayers v. Kiewit Infrastructure W. Co.</u>, No.

13  16CV06405PSGPJW, 2017 WL 4990460, at *4 (C.D. Cal. Oct. 26, 2017) ("Courts have held that

14  certification of a rest break class is not appropriate if the thrust of the liability argument is that the

15  class members were 'too busy' to take breaks, because the argument is not subject to common

16  proof and requires individualized inquiry into each employee's break decisions each shift." (citing

17  <u>Kenny</u>, 252 F.R.D. at 646)); <u>Manigo</u>, 2017 WL 5149225, at *4 ("Understaffing is not an unlawful

18  practice, nor is requiring employees to answer all incoming calls [and] [w]hile Plaintiffs argue

19  that these purported circumstances resulted in a *de facto* policy depriving the putative class of

20  timely meal and rest breaks, the evidence falls far short of establishing that connection [as] even

21  assuming Plaintiffs could show that all putative class members worked in a dispatch center that

22  was understaffed, and further that they were all subject to a policy requiring them to answer

23  incoming calls 'no matter the consequences,' these circumstances do not establish that the class

24  was uniformly denied the opportunity to take timely meal and rest breaks.");<u>Guzman-Lopez v.</u>

25  <u>Am. Bottling Co.</u>, No. 2:19-CV-04358-R-GJS, 2020 WL 913088, at *5 (C.D. Cal. Jan. 6, 2020)

26  (denying certification and noting defendants' argument that "[i]n the absence of an unlawful

27  policy forcing employees to forego meal periods . . . Plaintiff's time pressure argument is

28  subjective and does not support a classwide meal period violation claim.").

Plaintiff's "understaffing" theory relies principally on an allegation that employees had to obtain "permission" before taking breaks, and that such permission was not granted when the employees' departments were "understaffed." However, as noted above, several employees testified that they always received permission to take breaks or did not need permission to take breaks. The Court finds this conflict in evidence weighs against class certification.

The Court finds <u>Roth</u> analogous and supportive to this specific claim pertaining to understaffing, and also generally applicable to the analysis of the competing declarations above. There, the court found plaintiff did not establish "any uniform policy or practice that rendered each putative class member too busy or unable to take statutorily mandated rest or meal breaks." <u>Roth v. CHA Hollywood Med. Ctr., L.P.</u>, No. 2:12-CV-07559-ODW, 2013 WL 5775129, at \*7 (C.D. Cal. Oct. 25, 2013). The court noted that while "[m]any declarants testified that they frequently did not have adequate coverage to take proper breaks[,] many other[] nurses asserted that they were able to take their breaks by using the buddy system or being relieved by a charge or recourse nurse." <u>Id.</u> The court concluded that the "fact that some putative class members had no issue taking proper breaks demonstrates that there will be no way to determine that HPMC has a uniform, classwide policy of rendering employees unable to take rest and meal periods in each instance." <u>Id.</u>; <u>see also</u> <u>Rojas-Cifuentes</u>, 2018 WL 2264264, at \*6 (noting the <u>Brinker</u> concurrence presumption had been applied by a number of federal courts, however noting "[b]ut when a plaintiff does not allege a facially unlawful policy, evidence showing some employees may have been deprived of the opportunity to take a proper meal break does not amount to a policy and practice capable of determining an employer's liability on a class-wide basis." (citing <u>Ordonez v. Radio Shack, Inc.</u>, No. CV 10-7060, 2013 WL 210223, at \*7 (C.D. Cal. Jan. 17, 2013))).[27]

---

[27] In <u>Rojas-Cifuentes</u> "[w]hile Plaintiff cite[d] employee time records showing 61.1% of Wilmington employee shifts have short, late, or missing meal periods," the court found "this only shows potentially problematic meal periods for some employees," but noted that "[a]s in <u>Ordonez</u>, showing that some employees may have been deprived of an opportunity to take an uninterrupted meal break does not amount to a 'policy and practice capable of determining [Defendants'] liability on a class-wide basis.' " <u>Rojas-Cifuentes</u>, 2018 WL 2264264, at \*6 (quoting <u>Ordonez</u>, 2013 WL 210223, at \*7). The court relied on the finding that "the time records that Plaintiff cites say nothing about whether an employee failed to clock out for a meal period, or if they forgot to clock out for a meal period at the actual start of the meal period," and found like Ordonez, presented "numerous possibilities as to <u>why</u> certain employees may have had a [non-compliant] meal break during a given shift" and the court could not

Defendants argue many of Plaintiff's declarants admitted at their depositions that they were never required to ask permission before taking breaks and they still received meal and rest breaks when their departments were "busy." For example, Plaintiff's declarant, Miguel Arias confirmed at deposition that he was "allowed to take [his] rest breaks on [his] own without asking for permission." (Arias Dep. 50:18-20.) Plaintiff's declarant, Tyler Haumann was asked "when it came time for your meal period, were you required to ask for permission before you could start your meal period, or did you simply go and clock out and start your meal period on your own based on your own decision?," and Haumann answered: "[o]n my own – based on my own decision." (Haumann Dep. at 27:20-28:1.) Haumann also answered "[n]o," when asked if he was required to ask for permission before taking a ten-minute rest break. (Id. at 39:19-22.)

Plaintiff's declarant, Alexandria Rascon answered "[n]o" when asked if she had to get permission from anyone to take rest periods. (Rascon Dep. at 50:18-20, ECF No. 102-1 at 65.) Rascon was asked if "even during the busy time that started with Thanksgiving, at least as reflected here through December 21st, 2022, [whether she] got [her] full and timely meal period every single day," and Rascon answered "[f]or these, yes." (Id. at 67:24-68:3.)[28]

Defendants proffer that two of Plaintiff's other declarants also testified that they did not need to obtain permission before taking breaks. Hoppenrath answered "[c]orrect" when asked to confirm they did not have to get permission from a manager or supervisor before they were actually able to leave for the meal break every day. (Hoppenrath Dep. at 77:8-11; 13, ECF No. 102-1 at 56.) As to the other, Murray's testimony does not clearly equate to Defendants' framing:

> Q How did you know when to take your rest break?
>
> A When it was convenient for the group. So whatever the event

---

"conclude that any short, late, or missed meal break that plaintiff's expert identified corresponds to a legal violation on a class-wide basis." Rojas-Cifuentes, 2018 WL 2264264, at *7 (quoting Ordonez, 2013 WL 210223, at *7 (emphasis in original)). The court concluded that defendants had "rebutted the presumption arising from the concurrence in Brinker by convincingly arguing that their time records indicating late meal periods, no meal periods, or short meal periods for 61.1% of shifts does not reflect a common policy and practice capable of common resolution on a class-wide basis." Id.

[28] Defendants omitted the reference to the physical record and specific time period and qualified answer. (See Opp'n 25-26 n.20.) While the Court finds in favor of Defendants based on the all the evidence, the Court notes Defendant's framing of some deposition testimony, while within the bounds of advocacy, did not always provide the Court with the full picture in all cases, and thus was less persuasive.

1
2

> was, that's when you would take it. It could be any time. You know,
> say that the group was taking a break, if the group took a break,
> you'd take a break.

3   (Murray Dep. at 71:9–15, ECF No. 102-1 at 76.)

4        Finally, Defendants also argue declaration testimony of numerous employees confirms

5   that their ability to take full and timely breaks was never impacted by "understaffing."   For

6   example, Jose Brito, an employee who worked in the Kitchen Department, states in his

7   declaration that: "As a Kitchen Supervisor, I have never forced an associate to take a late,

8   interrupted, or short meal period due to understaffing or because required [sic] them to finish a

9   task before taking their meal period."  (Brito Decl. ¶ 28.)  Marshall Spence, an employee who

10  worked in the Engineering Department, states in his declaration: "I have never been forced to take

11  a late, interrupted, or short meal period due to 'understaffing' in my Department."  (Spence Decl.

12  ¶ 25).  Defendants provide declarations from fourteen other employees that provided similar

13  testimony.[29]  The Court finds the competing declarations, and legal authorities discussed above

14  pertaining to understaffing, weigh in favor of denying certification.

15        xi.    Derivative Claims

16        Plaintiff contends her unlawful business practices claim is derivative of her claims for

17  failure to provide meal and rest breaks, as an employee's right to meal break premiums vests

18  immediately upon the failure to provide the break.  See Murphy v. Kenneth Cole Prods., Inc., 40

19  Cal. 4th 1094, 1108, 155 P.3d 284, 293 (2007) ("Under the amended version of section 226.7, an

20  employee is entitled to the additional hour of pay immediately upon being forced to miss a rest or

21  meal period . . . a payment owed pursuant to section 226.7 is akin to an employee's immediate

22  entitlement to payment of wages or for overtime.").  Plaintiff similarly argues the claims for

23  waiting time penalties under Labor Code section 203 and accurate wage statements under Labor

24  Code section 226 are also derivative of her claims for failure to provide meal and rest breaks.  See

---

25
26
27
28

[29]  See, e.g., Allison Decl. ¶ 32 (same as Spence); Morales Decl. ¶ 40 (same); McElroy Decl. ¶ 35 (same); Sierra Decl. ¶ 23 (same); Carrizales Decl. ¶ 31 (same); Spencer Decl. ¶ 23 ("I did not have any issues with getting coverage for my meal period prior to my fifth hour of work.  My manager was able to fill in if no one else was available."). The Court notes that Eldred, a manager declared that: "On occasions when emergencies have prevented me from taking a timely, uninterrupted meal period I received a premium payment of one hour' pay.  Usually, however, there is enough coverage for me to be able to take a timely, uninterrupted meal period before my 5th hour of work even if emergencies arise."  (Eldred Decl. ¶ 14.)

Naranjo v. Spectrum Sec. Servs., Inc., 13 Cal. 5th 93, 117, 509 P.3d 956, 969 (2022) ("In short, missed-break premium pay constitutes wages for purposes of Labor Code section 203, and so waiting time penalties are available under that statute if the premium pay is not timely paid."); id. at 121 ("[A]n employer's obligation under Labor Code section 226 to report wages earned includes an obligation to report premium pay for missed breaks . . . failure to report premium pay for missed breaks can support monetary liability under section 226 for failure to supply an accurate itemized statement reflecting an employee's gross wages earned, net wages earned, and credited hours worked.").  Thus, Plaintiff maintains that common issues predominate with respect to the derivative claims and they should be certified as well.  See Westfall v. Ball Metal Beverage Container Corp., No. 216CV02632KJMGGH, 2019 WL 202677, at *1 (E.D. Cal. Jan. 15, 2019) ("[T]he court is persuaded the wage statement and waiting time penalties claims are derivative of the meal and rest break claims as a matter of law, which adequately satisfied the requirements for class certification.").

The Court disagrees.  Because the Court finds class certification should be denied as to Plaintiff's predicate claims for failure to provide meal and rest periods, it must also be denied as to her derivative claims.  See Le v. Walgreen Co., No. CV 18-1548-DOC (ADS), 2020 WL 3213684, at *8 (C.D. Cal. Apr. 27, 2020) ("Given that Plaintiffs' rest break claim does not survive the predominance analysis, Plaintiffs' derivative claims are also not appropriate for class certification.").

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

**IV.**

2

**CONCLUSION AND RECOMMENDATION**

3       Based on all of the foregoing discussion, the Court finds Plaintiff has not established

4   commonality, typicality, nor that class issues predominate over individual issues, and the Court

5   finds Plaintiff's motion for class certification should be denied.  See Fed. R. Civ. P. 23(a)-(b)(3);

6   Alcantar, 800 F.3d at 1054; Garcia, 359 F. App'x at 726; Castillo, 2019 WL 3818954, at *10,

7   aff'd sub nom., 980 F.3d 723; Lampe, 19 Cal. App. 5th at 851; Rivera, at 2022 WL 18337695, at

8   *10; Washington, 271 F.R.D. at 641.

9       Accordingly, IT IS HEREBY RECOMMENDED that Plaintiff's motion for class

10  certification be DENIED.

11      These findings and recommendations are submitted to the District Judge assigned to this

12  action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.  Within **twenty-**

13  **one (21) days** of issuance of this recommendation, any party may file written objections to the

14  findings and recommendations with the Court.  Such a document should be captioned "Objections

15  to Magistrate Judge's Findings and Recommendations."  The District Judge will review the

16  Magistrate Judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).  The

17  parties are advised that failure to file objections within the specified time may result in the waiver

18  of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v.

19  Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

20

21  IT IS SO ORDERED.

22  Dated:   **October 20, 2023**

_____
UNITED STATES MAGISTRATE JUDGE

23

24

25

26

27

28